**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Tom Wilkinson EASTLAND, and Cullen Reed Harris, Defendants–Appellants.**

**No. 92–8162.**

United States Court of Appeals, Fifth Circuit.

April 14, 1993.

---

**6.** See our original opinion in which we held that the sentence on count 5 was illegal for other reasons.

Ray Bass, Austin, TX, for Eastland.

Walter M. Reaves, West, TX (court-appointed), for Harris.

Richard L. Durbin, Jr., Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, TX, for U.S.

Before WIENER, BARKSDALE, and DeMOSS, Circuit Judges.

BARKSDALE, Circuit Judge:

In considering appellants' contention that evidence of methamphetamine manufacture should have been suppressed, we must determine, *inter alia*, whether violation of a state trespass law by its law enforcement officers compels, under principles of federalism, suppression of evidence obtained as a result and offered to prove violation of federal law. Appellants also contend that the district court erred in sentencing, by its assessment of drug quantity and enhancement for possession of a firearm and leadership roles. Finding no error, we AFFIRM.

I.

In April 1990, state narcotics officers in Arkansas received information that appellant Cullen Reed Harris was involved in drugs and may have been concealing them on his property in Glenwood, Arkansas. And that July, a confidential informant (CI) reported that appellant Tom Wilkinson Eastland was using a portable lab to manufacture and distribute methamphetamine in Texas, Arkansas, and Oklahoma. The CI further advised that Ronnie Dale Gearhart was involved in the manufacture and distribution of methamphetamine, and reported that he (the CI) had been dealing with Gearhart and Eastland for approximately five years. The CI believed that the base of the operation was run by a one-armed man, subsequently identified as Harris; and the CI informed that Harris would contact Eastland at least twice a month for

the profits from the sale of methamphetamine. That same month, the police received additional information linking Eastland and Harris, and identifying Gearhart as one of Eastland's main distributors.

State investigators in Arkansas and Texas compiled numerous reports detailing the activities of Eastland, Harris, and Gearhart from September 1990 to March 1991; they believed that Harris and Eastland were conducting a multi-state operation to manufacture, distribute, and possess methamphetamine. Harris was described as the "financier" of the Eastland methamphetamine manufacturing organization.

In an unrelated incident, Deputies Tom Hall and Jeff Duck received information from a CI on March 16, 1991, of suspicious activity in a wooded area of Leon County, Texas. Among other things, there had been several burglaries in the area during the past few months. The deputies approached the property and observed tire tracks on a trail, which was covered by plum bushes (two to three feet in height), leading to the heavily wooded area. The property was surrounded by a barbed wire fence; the entrance gate was chained and locked; and "no trespassing" signs were posted. Suspecting that the wooded property contained hidden stolen goods, the deputies climbed over the gate and entered the property to investigate. They discovered two wood frame buildings, and detected a faint odor associated with a methamphetamine laboratory.

On March 20, Sheriff Wilson notified Department of Public Safety (DPS) narcotics Lieutenant Stewart of the deputies' findings. Stewart dispatched Sergeants Brakefield and Von Allen to investigate; they entered the property and observed a motor home, but did not detect an odor of a chemical laboratory or otherwise see suspicious activity.

On March 21, Sheriff Wilson learned that the property was owned by Harris, who had an associate named Eastland; that both had criminal records involving contraband substance violations [1]; and that both were the object of a lengthy investigation in the Houston area. Sergeant Hammonds, with the Houston DPS office, who had been actively investigating the activities of Eastland and Harris since September 1990, supplied additional intelligence information on Eastland and Harris's involvement with methamphetamine production and distribution.

That day, Sergeants Brakefield and Rhynsburger returned to the property in search of evidence of a clandestine laboratory. As they approached a wood frame building, they detected a strong odor associated with a methamphetamine laboratory. Accordingly, they obtained a search warrant that night, and arrested Harris, Eastland, and Gearhart as they exited the motor home. A subsequent search of the property uncovered an operating methamphetamine laboratory. The officers recovered 47.68 pounds of methamphetamine, and 111.62 pounds of phenylacetone.

The next day, March 22, the officers executed a search warrant at Eastland's residence in Spring, Texas, and discovered twelve firearms [2]; however, they were missing when federal ATF agents returned with a warrant to seize them. On March 22, the state officers also executed a search warrant at Harris's residence in Glenwood, Arkansas. Among items seized were four firearms,[3] a triple beam scale, cash total-

---

1. In 1984, Eastland pleaded guilty to conspiracy to manufacture phenyl–2–propanone, and received a one year sentence. Harris pleaded guilty in 1982 to conspiracy to manufacture phenylacetone, methamphetamine, and amphetamine; he received a four year sentence.

2. The agents identified the weapons as follows: a Blackhawk .22 caliber; a Colt 45 automatic; a pistol of unknown brand being .32 or .38 caliber; two Remington model 700; a Weatherby brand .22; a Remington of unknown caliber; a Winchester 30–30 rifle; a Remington .22; an unknown model firearm; a Browning 12–gauge shotgun; and a Smith and Wesson revolver.

3. The firearms were described as follows: (1) a .32 caliber Winchester special level action with one expended case and six rounds in the magazine; (2) a Winchester model 75 semi-automatic .22 caliber long rifle; (3) A.M.T. Automag II semi-automatic stainless steel .22 caliber magnum, fully loaded with eight rounds; and (4) a pistola model .27 KAL 7.65 semi-automatic pistol.

ling approximately $212,000, marijuana, a jar containing methamphetamine/ephedrine residue, and a film canister containing methamphetamine residue.

Eastland and Harris were charged with conspiracy to manufacture more than 1000 grams of methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1) (count one), and the manufacture of 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (count two). The indictment stated that the conspiracy began on or about March 18, 1991, and continued until on or about March 21, 1991.

Prior to trial, Gearhart provided DPS with information on Eastland and Harris. He reported that Eastland had asked him to help manufacture methamphetamine; had offered to pay him after the manufacture and sale of same; and was present at the laboratory, and gave instructions regarding the manufacturing process. He also stated that Harris assisted in setting up the laboratory and in processing the methamphetamine.

Gearhart subsequently testified at trial that he became involved with Eastland's methamphetamine business in 1988, first as a purchaser of precursor chemicals and then as a methamphetamine distributor; that he received one quarter pound on approximately two occasions, and then a half a pound for approximately one and a half months; that he paid approximately $750 per ounce; and that he received methamphetamine from Eastland at his house in Spring, Texas on two occasions.

A jury found Harris and Eastland guilty as charged. At sentencing, over objection, the district court applied a three-level increase, pursuant to Sentencing Guideline § 3B1.1(b) for their respective roles in the offense, and a two-level increase for possession of a firearm during commission of the offense, pursuant to U.S.S.G. § 2D1.1(b)(1). Eastland and Harris were

sentenced, *inter alia*, to life imprisonment as to each count, to be served concurrently.

## II.

Appellants contest the denial of their suppression motion; and, for their sentences, contest the rulings on drug quantity, leadership roles, and weapons possession.

## A.

On two grounds, Eastland and Harris challenge the district court's refusal to suppress evidence of methamphetamine manufacturing, obtained through execution of the search warrant on March 21. First, they contend that information used in the affidavit to obtain the warrant, such as the faint chemical odor detected on March 16, stemmed from an unreasonable search of Harris's property on March 16, violative of the Fourth Amendment. According to appellants, law enforcement officers may not enter "open fields" on private property without some degree of justification.[4] Second, they maintain that, because, prior to execution of the warrant, Texas law enforcement officers trespassed onto Harris's property in violation of state law, the court should have suppressed the evidence. We reject both contentions.

## 1.

Appellants assert that some level of justification—whether it be probable cause or, at least, reasonable suspicion—is a prerequisite for warrantless police intrusions onto open fields. They contend that otherwise, the open fields exception will swallow the rule—the Fourth Amendment—and destroy a person's limited expectation of privacy engendered by, *inter alia*, state laws prohibiting non-consensual entry.

In *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924), the Supreme Court held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, hous-

---

4. Appellants concede that all observations were made from "open fields", and not from protect-  ed curtilage.

es, papers, and effects,' is not extended to the open fields". This bright line rule was called into question by *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which focused Fourth Amendment analysis on the individual's "constitutionally protected reasonable expectation of privacy". *Id.* at 360, 88 S.Ct. at 516 (Harlan, J., concurring). However, in *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Court reconciled *Hester* with *Katz*, by holding that "no expectation of privacy legitimately attaches to open fields". *Id.* at 180, 104 S.Ct. at 1742.

■ It is well-established that the Fourth Amendment does not apply to observations while standing on open fields. *See United States v. Pace*, 955 F.2d 270, 274 (5th Cir.1992) (open fields do not warrant Fourth Amendment protection); *Dow Chemical Co. v. United States*, 476 U.S. 227, 239, 106 S.Ct. 1819, 1827, 90 L.Ed.2d 226 (1986) (Fourth Amendment does not apply to an aerial surveillance of a 2000 acre industrial complex because it is an open field); *United States v. Dunn*, 480 U.S. 294, 302–05, 107 S.Ct. 1134, 1140–41, 94 L.Ed.2d 326 (1987) (officer may stand in field and flash light in defendant's barn because "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields").

■ Justification for a search or seizure under the Fourth Amendment is required because it demands reasonableness.[5] *See Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968). But, where, as here, the governmental intrusion does not implicate the Fourth Amendment, the reasonableness requirement is likewise not implicated.[6] Appellants' contention is without merit.[7]

## 2.

■ Appellants contend that the admission of evidence derived from an unlawful trespass by state officers[8] contravened principles of federalism.[9] According to appellants, because the Texas state exclusionary statute, *see* Vernon's Ann.Texas C.C.P. art. 38.23, would operate to exclude evidence seized pursuant to the March 21 warrant,[10] the evidence should be similarly inadmissible in federal court. We find no basis for so holding, either under the Constitution or pursuant to our supervisory powers.

■ The exclusionary rule is not "a personal constitutional right", but is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect". *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). The rule was not "created to discourage ... violations of state law." *United States v. Walker*, 960 F.2d 409, 415 (5th Cir.), *cert.*

5. "The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated." U.S. Const. amend. IV (emphasis added).

6. Therefore, we need not reach whether the officers had probable cause, or at least reasonable suspicion, to justify entry.

7. At oral argument in March 1993, appellants asserted for the first time that the intrusion implicated the Fourth Amendment because it interfered with possessory interests in property, relying on the recent opinion in *Soldal v. Cook County*, — U.S. —, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). Needless to say, we generally do not address issues raised for the first time at oral argument. Appellants did not brief this issue (at the very least, they could have done so by obtaining permission to file a supplemental

brief or by a Fed.R.App.P. 28(j) letter); nor did they raise it in district court. Nevertheless, we do not find *Soldal* controlling. *See, e.g., id.* at —— n. 7, 113 S.Ct. at 544 n. 7.

8. Texas law prohibits trespass, and provides no exception for law enforcement officers. *See* V.T.C.A. Penal Code § 30.05. Appellants maintain that the deputies' entry on March 16 constituted an unlawful trespass.

9. Appellants also assert that this infringed their right to due process, but do not brief this issue. Accordingly, we do not address it.

10. Appellants cite *State v. Hobbs*, 824 S.W.2d 317 (Tex.App.—San Antonio, 1992), for the proposition that the state exclusionary statute has been construed to prohibit the introduction of evidence seized as a result of a trespass.

*denied,* —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992). Accordingly, we have held:

> [T]he proper inquiry in determining whether to exclude the evidence ... is not whether the state officials' actions in arresting him were "lawful" or "valid under state law." The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution.

*Walker,* 960 F.2d at 415.

■ In determining the reach of the Fourth Amendment, it is well-established that federal law controls. *See California v. Greenwood,* 486 U.S. 35, 43–45, 108 S.Ct. 1625, 1630–1632, 100 L.Ed.2d 30 (1988). In *Greenwood,* the Supreme Court emphasized that the Fourth Amendment analysis focuses on "our *societal* understanding" of privacy, and does not depend upon concepts of privacy under the laws of each state:

> Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution. We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.

*Id.* at 43, 108 S.Ct. at 1630.

Citing *United States v. Robinson,* 650 F.2d 537 (5th Cir.1981), appellants maintain that our court recognizes the validity of state law in federal prosecutions. In *Fields v. South Houston,* 922 F.2d 1183, 1189–90 n. 7 (5th Cir.1991), however, we re-examined *Robinson,* and other cases in which we looked to state law to determine the validity of an arrest, and noted that if such decisions "have any remaining validity after *Greenwood,* it can only be on a nonconstitutional basis". *Id.* Accordingly, we turn to examine that basis for exclusion.

■ Where there is "some strong social policy", federal courts may extend exclusionary rules of evidence beyond constitutional and statutory requirements. *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). In *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the Court exercised its supervisory powers to eliminate what was known as "the silver platter doctrine". *Id.* at 216, 80 S.Ct. at 1443. Prior to *Elkins,* state officers were allowed to transfer to federal officers evidence obtained in violation of the federal constitution. The *Elkins* Court rejected this practice to maintain "healthy federalism":

> [W]hen a federal court sitting in an exclusionary state admits evidence lawlessly seized by state agents, it not only frustrates state policy, but frustrates that policy in a particularly inappropriate and ironic way. For by admitting the unlawfully seized evidence the federal court serves to defeat the state's effort to assure obedience to the Federal Constitution.

*Id.* at 221, 80 S.Ct. at 1446.

Appellants maintain that we should apply the rationale of the *Elkins* Court and, in the name of federalism, similarly exclude evidence obtained in violation of state law. According to appellants, "[a]llowing federal prosecutors to use evidence obtained in violation of state law thwarts the authority and ability of the states to protect their own citizens". For a number of compelling reasons, we refuse to so exercise our supervisory power.

First, and most significantly, appellants' contention is foreclosed by *Walker,* 960 F.2d at 415–16, in which we affirmed the district court's refusal to suppress fruits of arrest deemed unlawful under Texas law. We recognized that the Supreme Court would not "us[e] its supervisory powers to exclude evidence obtained unlawfully but under circumstances not violative of the Fourth Amendment". *Id.* at 416 (*citing United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980)).

In addition, a number of obvious, strong policy considerations militate against the

exclusion of evidence obtained in violation of state law. For example, such a rule would disrupt uniformity of evidentiary rules among federal courts, and involve them in difficult interpretations of state statutory and constitutional law. Accordingly, we likewise hold that the contours of the exclusionary rule to be applied in federal court are generally determined by federal, not state, law, even where evidence is obtained solely by state officers. *See United States v. Sutherland,* 929 F.2d 765, 770 (1st Cir.1991) (refusing to exclude evidence obtained by state officers in knowing violation of state law), *cert. denied, Fini v. United States,* — U.S. —, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991); *United States v. Pforzheimer,* 826 F.2d 200, 203 (2nd Cir. 1987) (federal exclusionary rule applies even though investigation conducted solely by state officers, and evidence would be inadmissible in state court). The district court properly admitted the evidence at issue.[11]

### B.

■ Appellants challenge the drug quantity amounts used to calculate base offense levels for sentencing. We review only for clear error a district court's findings concerning the quantity of drugs involved, *United States v. Ponce,* 917 F.2d 841, 842 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991). Of course, legal determinations are reviewed *de novo. United States v. Mourning,* 914 F.2d 699, 704 (5th Cir.1990).

The district court found appellants responsible for 47.68 pounds of methamphet-

amine and 111.62 pounds of phenylacetone, derived from the following seized objects: (1) four flasks containing 47.68 pounds of methamphetamine in liquid form; (2) a separatory funnel containing 7.62 pounds of phenylacetone; and (3) 13 plastic jugs containing 104 pounds of lye water with gold oilish rings of phenylacetone on the water's surface. A chemist for the government, estimated that, taken together, the jugs contained one-half pound of phenylacetone,[12] which yields one-quarter pound to one-half pound of methamphetamine respectively.[13]

#### 1.

■ The guidelines provide: "Unless otherwise specified, the weight of a controlled substance ... refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance". Note following Drug Quantity Table, U.S.S.G. § 2D1.1. Appellants rely on the "market-oriented approach" set forth in *Chapman v. United States,* — U.S. —, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), and contend that the district court erred in including the weight of the lye water because it was not useable or marketable, and because it was easily separable from the phenylacetone. This contention is foreclosed, however, by our post-*Chapman* decisions in *United States v. Walker, United States v. Sherrod,* and *United States v. Ruff.*

In *Walker,* 960 F.2d at 412, we held that *Chapman* did not overrule Fifth Circuit precedent providing for the inclusion of liquid waste when determining the relevant

---

**11.** We leave open whether there may be an instance of abuse and/or collusion in which a court might choose to exercise its supervisory powers and exclude evidence obtained in violation of state law. *See Sutherland,* 929 F.2d at 770.

**12.** The chemist explained,
When the process of cleaning up the phenylacetone reaction is taking place, the phenylacetone is placed in a separatory funnel, along with lye water that is the result of the lye here and distilled water. You put those chemicals in here, shake it very vigorously, let it sit for a

little while, the phenylacetone will float to the top, lye water is drained off through the spigot at the bottom. Typically its drained into these opaque plastic jugs. As they sit around for a while, or several hours, some of the phenylacetone that was trapped in the lye water will gradually float to the top and form these gold rings.

**13.** Methamphetamine production involves a three step process: (1) production of phenylacetone; (2) conversion of phenylacetone to methamphetamine oil; and, (3) conversion of the oil to a water soluble salt.

amount of drugs for sentencing.[14] We reaffirmed this principle in *United States v. Sherrod*, 964 F.2d 1501, 1510 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993), stating that the *Chapman* Court did not intend for its market-oriented analysis to be applied to mixtures of methamphetamine. Most recently, in *United States v. Ruff*, 984 F.2d 635, 641 (5th Cir.1993), we held that the district court correctly considered the entire weight of mixtures containing traces of phenylacetone and methamphetamine, even though testimony established that the solutions were probably residue from a manufacturing process, and that the amounts found were insufficient for use in manufacturing methamphetamine or amphetamine. We reasoned that precedent and the language of the guidelines mandated considering the entire amount of the mixture, because phenylacetone was "detectable".[15]

In short, we are bound by precedent.[16] Accordingly, appellants' contention that the court erred in considering 103 pounds of lye water fails.[17]

### 2.

Appellants contend that the district court misapplied the drug equivalency tables because it found that the phenylacetone was possessed for the purpose of manufacturing methamphetamine and therefore applied a higher conversion rate. Under U.S.S.G. § 2D1.1, one gram of phenylacetone is equivalent to 2.08 grams of cocaine if possessed "for the purpose of man-

ufacturing methamphetamine"; otherwise, one gram is equivalent to .375 grams of cocaine. Because this issue was not raised in district court, we review for plain error and find none. As stated, *see supra*, note 15, there is sufficient evidence in the record to support the finding that appellants retained the phenylacetone for the purpose of manufacturing methamphetamine.

### C.

Appellants contend that the district court erroneously applied U.S.S.G. § 3B1.1(b), which provides that "if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase [the offense level] by 3". Finding that appellants were involved in "a situation involving quite extensive criminal activity", the district court applied a three level increase for each. In reaching this conclusion, the district court looked beyond the offense of conviction, which was limited to conspiracy to manufacture methamphetamine from approximately March 18 to March 21, and relied on evidence establishing that Eastland and Harris were chief participants in a larger multi-state conspiracy to manufacture and distribute methamphetamine; that Eastland recruited Gearhart, who distributed six pounds of methamphetamine over the course of approximately 14 months; and that Harris was the financier of the Eastland organization.

**14.** *See United States v. McKeever*, 906 F.2d 129, 133 (5th Cir.1990) (considered 26 liters of a substance that contained detectable amounts of phenylacetone), *cert. denied, Newman v. United States*, —— U.S. ——, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991); *United States v. Butler*, 895 F.2d 1016, 1018 (5th Cir.1989) (considered entire 38 pound mixture of lye water even though it contained only seven to 14 grams of a controlled substance), *cert. denied*, 498 U.S. 826, 111 S.Ct. 82, 112 L.Ed.2d 54 (1990); *United States v. Baker*, 883 F.2d 13, 15 (5th Cir.), *cert. denied*, 493 U.S. 983, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989) (considered 40 pound liquid even though most was waste material).

**15.** The case before us is far more compelling than *Ruff*, where the solution appeared to be pure waste. Here, because the phenylacetone

was capable of producing one-quarter pound to one-half pound of methamphetamine, the district court could easily infer that appellants could use the wash to capture the remaining phenylacetone.

**16.** "In this circuit, one panel may not overrule the decision—right or wrong—of a prior panel, absent en banc reconsideration or a superseding contrary decision of the Supreme Court." *In re Dyke*, 943 F.2d 1435, 1442 (5th Cir.1991).

**17.** Similarly, Harris's contention that the district court erred in basing his offense level on 47.68 pounds of liquid methamphetamine, because the liquid was not in useable form and contained poisonous by-products, is foreclosed by Fifth Circuit precedent cited *supra*.

On appeal, appellants do not deny their participation in the larger conspiracy, nor do they maintain that the court erred in its characterization of their role; rather, relying on *United States v. Barbontin*, 907 F.2d 1494 (5th Cir.1990), they urge a narrow reading of the guidelines and contend that the court misapplied them by looking beyond the offense of conviction. This contention is foreclosed by a clarifying amendment to the guidelines, effective November 1, 1990,[18] and by Fifth Circuit precedent. *See United States v. Mir*, 919 F.2d 940, 945 (5th Cir.1990) ("[i]t is not the contours of the offense charged that defines the outer limits of the transaction; rather it is the contours of the underlying scheme itself").[19]

The conduct underlying the offense of conviction was part of a larger scheme to manufacture and distribute cocaine; accordingly, we conclude that the court correctly applied the guidelines in considering appellants' conduct in the multi-state conspiracy.

## D.

■ Appellants' final contention is that the district court erred by use of § 2D1.1(b)(1), which permits a two level increase in the offense level "[i]f a dangerous weapon (including a firearm) was possessed". Because the decision to apply § 2D1.1(b)(1) is a factual one, we review only for clear error. *United States v. Paulk*, 917 F.2d 879, 882 (5th Cir.1990).

■ Understandably again seeking a narrow interpretation of the guidelines, appellants' contend that § 2D1.1(b)(1) requires possession during the offense of conviction. But this is precisely the contention we rejected in *United States v. Paulk*. There, we held that "[t]he district court could properly consider related relevant conduct in determining the applicability of section 2D1.1(b)(1)". 917 F.2d at 884. Even though, at that time, the language of § 1B1.3 specified possession "during the commission of the offense", we nonetheless allowed consideration of relevant conduct because we found "[n]o reason [to] distinguish[ ] consideration of relevant uncharged conduct when computing a defendant's base sentence level under section 1B1.3(a)(2) from consideration of relevant uncharged conduct when determining a specific offense characteristic under section 1B1.3(a)(2)". *Id.* at 884. Since *Paulk*, the sentencing commission has deleted the language "during the commission of the offense" from the text of § 2D1.1(b)(1) to clarify that the relevant conduct provisions apply. *See* U.S.S.G.App.C amendment 394. In view of the foregoing, the district court properly considered the scope of appellants'

---

**18.** An amendment to the commentary accompanying U.S.S.G. § 3B1.1 clarified whether a court should consider collateral conduct in determining a defendant's role in the offense. The new introductory comment provides:

> The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.* all conduct included under § 1B1.3(a)(1)–(4), and not solely on the basis of elements and acts cited in the count of conviction.

U.S.S.G. § 3B1.1 introductory commentary.

**19.** *Mir* reconciled potentially conflicting precedent. In *Barbontin*, 907 F.2d at 1498, we held that "a section 3B1.1(a) adjustment is anchored to the transaction leading to the conviction ... [t]he sentencing court is thus not at liberty to include those members ... not involved in the transaction of conviction for purposes of section 3B1.1(a) departure". Shortly thereafter, in *United States v. Manthei*, 913 F.2d 1130 (5th Cir.1990), we refused to read *Barbontin* for the proposition that a court may never consider relevant conduct when making an adjustment under § 3B1.1(a). Rather, we held that "while the § 3B1.1(a) 'offense' is the 'offense charged,' the scope to be considered is, where applicable, much wider—it encompasses the above discussed relevant conduct, the underlying activities and participants that directly brought about the more limited sphere of the elements of the specific charged offense". *Id.* at 1136. *Mir* reconciled the two cases, holding that "*Barbontin* and *Manthei* instruct that while an upward adjustment for a leadership role under section 3B1.1 must be anchored in the defendant's transaction, we will take a common-sense view of just what the outline of that transaction is". *Mir*, 919 F.2d at 945. Referring to the clarifying amendment discussed *supra*, we also stated that "[t]his language shows that section 3B1.1 is intended to comport with other guidelines sections allowing a sentencing judge to look beyond the narrow confines of the offense charged to consider all relevant conduct". *Id.* at 945.

larger conspiracy when determining the appropriateness of a two point increase.

■ We next examine whether the court clearly erred in finding that appellants possessed firearms during the course of their multi-state conspiracy. The commentary to § 2D1.1(b)(1) explains that the enhancement factor "reflects the increased danger of violence when drug traffickers possess weapons", and should be applied "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense". U.S.S.G. § 2D1.1 comment (n.3). Weapon possession is established if the government proves by a preponderance of the evidence "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant". *United States v. Hooten,* 942 F.2d 878, 882 (5th Cir.1991). "Generally, the government must provide evidence that the weapon was found in the same location where drugs or drug paraphernalia are stored or where part of the transaction occurred". *Id.*

### 1.

■ Over ten pistols and rifles were discovered in Eastland's residence the day after his arrest. The majority were found in his bedroom, including a loaded 45 automatic in a nightstand by his bed. (As stated, the weapons had been removed by the time federal agents returned to seize them.) At the sentencing hearing, Brakefield testified that, according to Gearhart, Eastland routinely carried a firearm with him.[20] Intelligence information reported that Eastland dealt methamphetamine out of his house.

The larger conspiracy involved both manufacture and distribution of methamphetamine. Because Eastland dealt from his residence, it became part of the situs of the offense. *See United States v. McKeever,* 906 F.2d 129, 134 (5th Cir.1990). And, because evidence indicated that he carried a gun in connection with his methamphet-

amine dealings, it is "not clearly improbable" that the weapons discovered in his residence were likewise connected. In view of this evidence, we conclude that the district court did not clearly err.

### 2.

■ Concerning Harris, federal agents discovered four firearms in a trailer on his property in Pike County, Arkansas, two of which were loaded. Also in the trailer was a *Merck Index* (describes elements used in the manufacture of narcotics), and traces of methamphetamine. In addition, the agents recovered over $200,000, and other drug paraphernalia from the property. In view of the presence of methamphetamine, currency, and paraphernalia, we conclude that the district court did not clearly err in finding that the firearms were connected to the conspiracy to manufacture and distribute methamphetamine.

Harris's focus on the distance between the laboratory and his residence ignores the fact that the conspiracy under consideration included both manufacture and distribution. Moreover, that the firearms possessed were not the usual firearms or tools of the trade, does not render the court's findings clearly erroneous. Evidence at trial established that Harris had acquired literature to convert semi-automatic firearms to fully automatic. And, given the evidence indicating the use of his residence in furtherance of the conspiracy, it is, again, "not clearly improbable that the [firearms were] connected to the offense".

### III.

For the foregoing reasons, the judgments of the district court are

AFFIRMED.

---

**20.** We reject Eastland's objection to the admission of this hearsay at his sentencing hearing. It goes without saying that hearsay is admissible at sentencing. *See Mir,* 919 F.2d at 943 n. 3.

We find no basis in the record for concluding that the district court abused its discretion in considering this testimony.