**Lakeith Lawayne COLEMAN,
Appellant,**

v.

**The STATE of Texas.**

**Nos. 146603, 148003.**

Court of Criminal Appeals of Texas.

Sept. 29, 2004.

Belinda Johnson Chagnard, Houston, for Appellant.

Donald W. Rogers, Jr., Asst. District Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

### OPINION

MEYERS, J., delivered the unanimous opinion of the Court.

Appellant was found guilty of possession with intent to deliver cocaine weighing

more than 4 grams and less than 200 grams, and PCP weighing at least 400 grams. The jury found that Appellant had used a deadly weapon, a firearm, during the commission of each offense and sentenced Appellant to 50 years imprisonment for the cocaine offense and 60 years imprisonment for the PCP offense, and assessed a fine in the amount of $150,000. Appellant appealed, claiming that under the facts and circumstances presented at trial, the evidence was insufficient to support the jury's finding that he used or exhibited a deadly weapon during the commission of each offense. The Court of Appeals affirmed the judgment of the trial court. We granted review to determine whether the evidence was sufficient to support the jury's affirmative deadly weapon finding. We will affirm the decision of the Court of Appeals.

## Facts

Two officers, Fuller and Lerma, were conducting narcotics surveillance in the 3800 block of Kashmere in Houston when they saw a truck drive up and park in front of 3818 Kashmere. The officers recognized the truck as one they had seen a few days earlier at 4908 Crane Street. Appellant got out of the truck, walked around to the front of it while talking on a cell phone, and then got back into the truck. A car then pulled up and stopped behind Appellant's truck. A man got out of the car, got into the passenger's seat of Appellant's truck, and after a minute or two, got out of the truck and left. This pattern of behavior was observed two more times. Officer Lerma testified that because of this behavior, the officers believed that Appellant was involved in illegal activity with drugs.

Officer Fuller contacted Officer Gratz, who was in uniform and assisting the officers, and told him to approach and detain Appellant. Gratz handcuffed Appellant and placed him in the back seat of the patrol car. The officers smelled the odor of PCP emanating from Appellant's truck when the door was opened. Officer Fuller approached Appellant and asked if there were narcotics in the truck, and Appellant said there were not. Officer Fuller then asked Appellant to give the officers consent to search his truck and his residence. After Appellant's handcuffs were removed, Appellant read and signed a consent-to-search form.

The officers searched Appellant's truck, but found no narcotics. They then asked Appellant where he lived, and Appellant gave them the wrong address.[1] Upon discovering that the truck Appellant was driving was registered at 4908 Crane, the officers asked him again and he gave them the Crane address. With Appellant's consent, they then drove him to the residence, where Officers Fuller and Gratz opened the house door with a key from Appellant's key chain. Appellant remained in the patrol car while the officers searched the house.

The house had two bedrooms: The front room contained a bed, a dresser, a television, and a safe, while the back room contained an entertainment center, a weight set, and some clothes and shoes piled on the floor. Inside the back room, Officer Fuller found a number of empty vials, which he testified were typically used "to sell PCP in and they also had a little dropper which they use to put the PCP in the vials." Behind the entertainment center, he also discovered a juice bottle containing PCP. Appellant had told Officer

---

**1.** There is discussion in the record about whether Appellant gave the wrong address or simply mis-spoke.

Lerma that there might be some crack cocaine in the kitchen. When Lerma searched the kitchen, he discovered a small beaker-type glass containing crack cocaine as Appellant had said. In the dining room, more empty vials were found, as well as a large amount of powdered cocaine on a chair under the dining room table. In the front bedroom, the officers found a closed safe containing two large bottles of PCP, large amounts of money, jewelry, and Appellant's college student identification card. Next to the safe, on a table beside the bed, the officers discovered two pieces of unopened mail addressed to Appellant at 4908 Crane. They also recovered a 9–millimeter pistol and a .22 rifle "from the front bedroom, with the bed." [2] An assault rifle was also recovered, but the record does not indicate where in the house it was found. The utilities at the house were registered in Appellant's name, and Appellant told an interviewer at the jail that he lived alone in the house.

**Procedural history**

At trial, during its deliberation at the guilt/innocence stage, the jury sent out a note regarding the deadly-weapon special issue. The note asked: "Please define 'commission of the offense.' Does this mean during the defendant's detainment or in relation to the offense? Is this a specific point in time?" The court answered: "In these cases 'commission of the offense' means during the time the defendant possessed a controlled substance with intent to deliver it." [3] The jury found Appellant guilty of both the cocaine and the PCP offense, and also found that Ap-

pellant used a deadly weapon, a firearm, during the commission of each offense.

On appeal, Appellant argued that the evidence was insufficient to support an affirmative finding on the deadly-weapon issue. *Coleman v. State*, 113 S.W.3d 496, 502 (Tex.App.Houston [1st Dist.] 2003). The Court of Appeals, citing *Patterson v. State*, 769 S.W.2d 938 (Tex.Crim.App. 1989), determined that the following factors could enable a rational jury to find that Appellant used a firearm to facilitate his possession of the narcotics: 1) the guns were found "in close proximity to the narcotics," in the same bedroom as the safe which contained the large bottle of PCP, money, jewelry, and Appellant's college student identification card; 2) mail found in the front bedroom was addressed to Appellant; and 3) the State presented evidence that Appellant lived in the house alone. *Coleman*, 113 S.W.3d at 502–03. Thus, the court held that the evidence was sufficient to support a finding that Appellant used or exhibited a deadly weapon during the commission of the offense. *Id.* at 503.

In this appeal, Appellant maintains that the evidence was insufficient to establish that he used or exhibited a deadly weapon during the commission of each offense because: 1) he was handcuffed and sitting in the back of a patrol car at the time of the search and thus had no access to the guns; 2) there was no evidence that his fingerprints were on the guns or that the guns were registered in his name; 3) no evidence established the guns as deadly weapons, and because there was no one present at the time the weapons were found, the danger was only hypothetical; [4]

---

2. The record does not indicate where the guns were found, i.e., whether they were found under the bed, on the bed, etc.

3. Neither the accuracy of the jury charge nor the judge's response to the jury questions is disputed.

4. Appellant cites to *Cates v. State*, 102 S.W.3d 735 (Tex.Crim.App.2003), in support of this

4) the weapons were not located in close proximity to the drugs; 5) no drugs were discovered in the front bedroom or any area shown to be under Appellant's exclusive control;[5] and 6) there was no evidence of Appellant's actual physical possession or control of the weapons. We will discuss the validity of these more thoroughly below.

**Standard of review**

■ Because Appellant is challenging the legal sufficiency of the evidence, this Court must view the evidence in the light most favorable to the verdict. *Gale v. State*, 998 S.W.2d 221, 223 (Tex.Crim.App. 1999). In doing so, we must determine whether a rational trier of fact could have found beyond a reasonable doubt that Appellant used the guns to facilitate possession and delivery of the narcotics. *Id.*

**Meaning of "exhibit" versus "use"**

The deadly weapon finding is important to Appellant in that it affects his eligibility for parole. Section 508.145(d) of the Texas Government Code states that "an inmate serving a sentence ... for an offense for which the judgment contains an affirmative finding under Section 3g(a)(2) of [Article 42.12, Code of Criminal Procedure]" must serve a longer period, without consideration of good conduct time, before he may be released on parole. TEX. GOV'T CODE ANN. sec. 508.145(d) (Vernon 2004). Article 42.12 section 3g(a)(2) applies "when it is shown that a deadly weapon as defined in Section 1.07, Penal Code, was *used*

or *exhibited* during the commission of a felony offense...." TEX.CODE CRIM. PROC. ANN. art. 42.12, sec. 3g(a)(2) (Vernon 2004) (emphasis added). It is this "used or exhibited" language in article 42.12, section 3g(a)(2) that is under discussion today.

■ *Patterson*, cited by both parties, is the key Texas case discussing the difference between the meaning of "exhibit" and the meaning of "use" in article 42.12 of the Texas Code of Criminal Procedure. 769 S.W.2d at 941. The Court explained that while the word "use" typically means that a deadly weapon must be "utilized, employed, or applied in order to achieve its intended result 'the commission of a felony offense or during immediate flight therefrom,'" that "use" could mean "*any* employment of a deadly weapon, even simple possession, if such possession facilitates the associated felony." 769 S.W.2d at 941. The word "exhibit," however, requires a weapon to be "consciously shown, displayed, or presented to be viewed." *Id.* Thus, as the *Patterson* Court explained, one can "use" a weapon without exhibiting it, but not vice versa. *Id.* Neither side disputes that the weapons at issue in this case were not "exhibited" within the meaning of the article, and we will therefore discuss only whether a rational jury could have found that the weapons were "used" during the commission of each felony.

In *Patterson*, the defendant was convicted of possession of methamphetamine and using or exhibiting a deadly weapon during the offense. *Id.* at 939. The police had

argument. However, the issue in *Cates* was whether a car driven by Cates was used as a deadly weapon, because a car is not a deadly weapon *per se*. Section 1.07(a)(17) of the Texas Penal Code specifically defines firearms as deadly weapons. TEX. PENAL CODE ANN. § 1.07(a)(17) (Vernon 2003). Thus, *Cates* is inapplicable to Appellant's case, as is the issue of whether the weapons found in the residence were deadly weapons.

5. We note that some of Appellant's arguments are not entirely accurate statements of the record. For example, the record indicates that, as to "4)," weapons *were* discovered in the same bedroom as two bottles of PCP, and as to "5)," PCP was indeed found in the safe in the front bedroom.

kicked in the door to the house, and the defendant had been sitting at the end of a sofa. *Id.* Lying next to the defendant on an end table were a bag with methamphetamine inside, a wallet containing over nine hundred dollars, and a "gun boot." *Id.* Upon the police entering, the defendant raised his hands and told the officers he had a gun between his legs, and that there was another gun at the end of the sofa. *Id.* On appeal, the defendant argued that he possessed the gun to protect the money, not the narcotics. *Id.* at 940. This Court concluded that a rational trier of fact could have determined that the defendant had used the firearm during the commission of the offense because the jury could have determined that the firearm protected and facilitated the defendant's care, custody, and management of the contraband. *Id.* at 942.

The Court of Appeals also discussed another case, *Wynn v. State,* 847 S.W.2d 357 (Tex.App.Houston [1st Dist.] 1993), *aff'd on other grounds,* 864 S.W.2d 539 (Tex. Crim.App.1993). In *Wynn,* the police had been called about two men walking around the neighborhood knocking on doors. When officers arrived, one of the men, Shepherd, pointed down the street to a garage that was on fire. *Id.* The officer called the fire department and requested an ambulance. The defendant told the officers that he was replacing a gas tank in the car in the garage when a fire started. Shepherd confronted the defendant in front of Officer Braunig, accusing the defendant of trying to burn down his house. *Id.* Later, Shepherd denied it was his house. When the fire was out and the officers were pulling the car out of the garage, the gas tank fell off the car and the officers noted that the gas tank had two separate compartments, much like those often used to hide drugs. *Id.* The defendant signed a consent form permitting the police to search the house, and the

officers placed the defendant and Shepherd in a patrol car during the search.

In the kitchen, the officers found scales, a plastic bag with cocaine inside it, and other drug paraphernalia. They also found two pounds of cocaine, $34,000 under a chest, a briefcase containing over $70,000, a firearm silencer, and other such items in one of the bedrooms. *Id.* at 359. In another bedroom, they found two handguns hidden beneath a blanket. They found the defendant's wallet in his bedroom (the middle bedroom), but no guns or narcotics were found in that room. *Id.* The jury found the defendant guilty of possession with intent to deliver a controlled substance, and also found that he had used or exhibited a deadly weapon during the commission of the offense. *Id.* at 358. In reversing the trial court, the Court of Appeals in *Wynn* considered the following factors persuasive: 1) the defendant was in the patrol car while the police searched the house and "he was not in the house with the drugs and the guns as in *Patterson;* " 2) neither the guns nor the drugs were found in the middle bedroom, which was the only bedroom linked specifically to the defendant; 3) the defendant's fingerprints were not found on the guns or in the bedroom where the guns were found; 4) clothing found in the bedroom where the gun was found did not belong to the defendant; and 5) at least two other people had access to the house. *Id.* at 360–61.

Appellant interprets *Wynn* to mean that, "where no individual is observed in actual physical control over the weapon, and where the weapon is found a significant distance from the controlled substance, then the evidence is not sufficient to support an affirmative finding of use or exhibition of a deadly weapon during the commission of an alleged narcotics offense." We disagree with such a sweeping

statement. First, we believe a defendant's proximity to the guns at the time of the search is not dispositive. Second, in *Wynn*, the guns and narcotics were found in a room containing clothes that did not belong to the defendant, and no narcotics or guns were found in the only bedroom linked to Wynn. Additionally, evidence was presented at the *Wynn* trial that at least two other people had access to the house. *Id.* at 361. Here, however, drugs and weapons were found in the only bedroom with a bed, mail found in that bedroom was addressed to Appellant, he told an interviewer that he lived in the house alone, and the utilities were registered in his name. Furthermore, although the trial court in *Wynn* found that "a handgun was used and exhibited," the Court of Appeals reformed the judgment because the jury was charged on the defendant only as a *party*, and in such a case, at that time,[6] there had to be evidence that the defendant "*personally* used a deadly weapon" in order to support a deadly weapon finding." [7] *Id.* at 361 (emphasis added), citing *Reyes v. State*, 741 S.W.2d 414, 432 (Tex. Crim.App.1987). Appellant was not charged as a party. For the many reasons just discussed, we do not find *Wynn* to be on point in our decision-making process today.

Another case, *Gale*, 998 S.W.2d 221, involved an affirmative deadly-weapon finding for a defendant who was found guilty of possession of marijuana. In *Gale*, undercover officers conducted a "knock-and-talk" and spoke with the defendant and his wife at their home. *Id.* at 223. The defendant and his wife showed the officers to their closet, in which the officers found a mini-rifle and a trash bag containing 20 pounds of marijuana separated into smaller bags. *Id.* In the same closet, but not contained in the trash bag, were two other rifles, a handgun, bullets, and a box containing $4500 in cash. *Id.* In determining that a rational jury could find that the defendant had used the weapons to facilitate possession of marijuana, the Court noted that the case was not one in which "a person's weapons are found in a gun cabinet or closet completely separate from the criminal enterprise; here, all the weapons were virtually inches away from the contraband and its alleged proceeds." *Id.* at 226.

In Appellant's case, the drugs were found all over the house. And, as already noted, two guns were found in a room inside a safe containing two large bottles of PCP and large amounts of cash. Although Appellant was handcuffed rather than present in the house as the defendant was in *Gale*, we have already stated that we do not find the defendant's presence to be necessary.[8] In *Gale*, the Court stressed the proximity of the weapons to the drugs, not the proximity of the guns to

6. At the time of the *Wynn* trial, Article 42.12, § 3g(a)(2), stated: (a) The provisions of Sections 3 and 3c of this Article do not apply: * * * (2) to a defendant when it is shown that the defendant used or exhibited a deadly weapon as defined in Section 1.07(a)(11), Penal Code, during the commission of a felony offense or during immediate flight therefrom....

The statute was amended in 1991 to include the phrase, "or was a party to the offense and knew that a deadly weapon would be used or exhibited."

7. The court stated that "since the law of the parties is involved, the affirmative finding must show that *the appellant* used or exhibited the deadly weapon." *Id.* at 361.

8. Officer Fuller testified that, for safety purposes and to preserve evidence, it is police policy to place a detainee in the patrol car during the search of a residence. It does not make sense to say that because the officers handcuffed Appellant and put him in the car during the search, that the Appellant is therefore immune from a deadly-weapon finding.

the defendant. *Id.* at 226. The real question is whether the weapons are found to have facilitated Appellant's possession and intended distribution of the drugs. In this case, a rational jury could have found that Appellant "used" the weapons in order to facilitate his possession and distribution of the narcotics.

In *Sanchez v. State,* 906 S.W.2d 176 (Tex.App.Ft. Worth 1995, no writ), the defendant was convicted of aggravated possession with intent to deliver cocaine, and the jury made an affirmative deadly-weapon finding. The officers discovered weapons next to cocaine in the defendant's bedroom closet, and there were other weapons and a drug ledger in the same bedroom. *Id.* at 181. Additionally, the defendant admitted that he owned the guns, his mother and sisters testified that they knew nothing of the drugs or weapons, and police testified that guns are often used by drug dealers to protect themselves. *Id.* Though the defendant was not present during the officers' search of his house, the Court of Appeals stated that "the cumulative effect of factors enumerated above is sufficient to warrant a rational trier of fact to conclude that Sanchez 'used' the firearms to facilitate his care, custody, and management of the contraband." *Id.* Likewise, the "cumulative effect" of the factors discussed here in Appellant's case could have allowed a rational jury to determine that he used the weapons to protect the narcotics and the proceeds therefrom. As the trial judge in Appellant's case instructed the jury, "during the commission of the offense" in a drug possession case means just that: while in possession of drugs with intent to deliver them, the defendant is committing the offense. It is irrelevant that Appellant was not in the residence at the time the officers discovered the weapons.

**Conclusion**

Viewing the facts in the light most favorable to the verdict below, we hold the evidence sufficient to support an affirmative finding that Appellant used a deadly weapon during the commission of each offense. The jurors were free to believe or disbelieve portions of the testimony given by the State and by the defense, and the jury could have reasonably believed that the guns protected or facilitated Appellant's possession of the drugs with intent to deliver. We therefore affirm the Court of Appeals.

COCHRAN, J., filed a concurring opinion, in which PRICE, JOHNSON, and HOLCOMB, JJ., joined.

COCHRAN, J., concurring, joined by PRICE, JOHNSON, and HOLCOMB, JJ.

Although I join the Court's opinion, I add the following remarks for two reasons. First, I am concerned that many deadly weapon findings now no longer bear any relationship to the original legislative purpose. Second, I think we could provide greater guidance on when it is rational to infer that one who possesses a deadly weapon has "used" it to facilitate the commission of a drug possession offense.

I.

Use of the "deadly weapon" enhancement statute has followed the "Big Bang" theory of creation. The statute was intended as a simple but powerful deterrent message to those about to embark upon their next criminal enterprise: leave your guns and other deadly weapons at home. One Senate subcommittee speaker explained the rationale:

> [T]he point we are trying to get to when we use the language "used or exhibited" is simply to say that if a person is going to commit an offense, leave that firearm

at home. Don't take it with you. Don't have the opportunity to use it; don't exhibit it. Don't be around a firearm if you are going to commit an offense because you know that if you do the offense or the penalty, or the combination of the two would perhaps be more onerous than if you commit the offense without the use of a firearm.[1]

That specific and limited deterrence purpose was, and is, laudable. However, once that original big bang occurred, the universe of deadly weapon findings expanded exponentially. It has fallen prey to "mission creep" into areas unforeseen and probably unintended by the Legislature. It is applied to cars used in the commission of D.W.I.[2] It is applied to a septic tank containing liquid when a mother, responsible for watching a child, fails to cover that tank, and the child drowns in it.[3] It is applied to a man's sexual organ and bodily fluids when he is H.I.V. positive and rapes a child.[4] It is applied to a dentist's sedatives when used to anesthetize a patient who accidentally dies during dental treatment.[5] Indeed, one is hard pressed to think of how any homicide-murder, manslaughter, or criminally negligent homicide might be committed without the use of some "deadly" agent that caused the victim's death.[6]

The use of deadly weapon findings has grown out of all bounds. Given the literal words of the statute—"a deadly weapon . . . was used or exhibited during the commission of a felony offense or during immediate flight therefrom"—this is not surprising. Ultimately, however, it is the Legislature's prerogative to amend the law if the words of the statute are being applied more broadly than the Legislature intended. Until that time, we are left with the literal wording of the statute and our historical interpretation of it.

The case that began the "Big Bang" was *Patterson v. State*,[7] in which this Court held that "use" of a deadly weapon " 'extends as well to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony.' "[8] In that case, officers executed a search warrant at a third party's home. They found the defendant sitting on a sofa with a suede bag containing methamphetamine, a wallet containing $905, and a "gun boot" containing bullets, on the end table beside him. Patterson told the police that

1. *Tyra v. State*, 897 S.W.2d 796, 803 (Tex. Crim.App.1995) (Maloney, J., concurring) (quoting Senate Subcommittee on Criminal Affairs, Transcript of Discussion on SB 152, Feb. 15, 1977, at p. 15). Judge Maloney quoted an unnamed speaker at the Senate Subcommittee Hearing on SB 152, the bill that ultimately became section 3g of TEX. CODE CRIM. PROC. art. 42.12, the "deadly weapon" statute. *See also Muscarello v. United States*, 524 U.S. 125, 132–34, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (setting out and analyzing Congress's similar intent when it enacted analogous federal statute).

2. *See Mann v. State*, 58 S.W.3d 132, 132 (Tex. Crim.App.2001).

3. *See Rankin v. State*, 46 S.W.3d 899, 900 (Tex.Crim.App.2001).

4. *Najera v. State*, 955 S.W.2d 698, 700–01 (Tex.App.—Austin 1997, no pet.).

5. *Davis v. State*, 955 S.W.2d 340, 352 (Tex. App.—Fort Worth 1997, pet. ref'd).

6. *See, e.g., Ex parte Beck*, 769 S.W.2d 525, 526 (Tex.Crim.App.1989) (stating that "any allegation which avers that a death *was caused* by a named weapon or instrument *necessarily includes* an allegation that the named weapon or instrument was, 'in the manner of its use . . . capable of causing' (since it *did* cause) death").

7. 769 S.W.2d 938 (Tex.Crim.App.1989).

8. *Id.* at 941 (citation omitted; emphasis in original).

he had a gun on the floor between his left leg and the end of the sofa. Indeed he did. This Court held that the evidence was sufficient to support an affirmative finding that he used a deadly weapon while committing the felony offense of possessing methamphetamine.[9] Although we did not expressly say so, *Patterson* involved a situation in which the defendant arrived at another person's home armed with a gun and carrying drugs. One might fairly ask why Patterson was toting his gun on what would appear to be something more than a mere social visit unless he was using it to protect his drugs. Although there was no evidence that Patterson had affirmatively employed the weapon while in the apartment, it was not irrational to think that, under the specific circumstances in that case, those two items, the gun and drugs went together, as in the old Sinatra song, like "Love and Marriage."

Perhaps Judge Rusty Duncan, in his 1989 decision in *Patterson*, construed the statutory word "use" in an overly broad manner, when he stated that mere possession of a deadly weapon suffices to constitute its use if that possession furthers or facilitates the felony. But his construction has endured and prospered in Texas law for the past fifteen years. It is now gospel. And, after *Patterson*, our jurisprudence has subtly morphed, such that possession of any drugs, actual or constructive, coupled with possession of a deadly weapon, either actual or constructive, will almost always support a deadly weapon finding.

This case, for example, might leave the impression that if you keep any drugs in your home, office, or car, and if you also own a gun and keep it in your home, office, or car, possession of these two items in the same general location suffices to prove, beyond a reasonable doubt, that the guns were "used" to facilitate the possession of the drugs. I do not think that the majority opinion intends that implication. Yet it lingers in the air.

## II.

This case, however, is not about the mere possession of "any" drugs. It is about the operation of a large-scale drug manufacturing plant and retail distribution outlet. The house was littered with illicit drug manufacturing material, wholesale drug material, retail drug items, and a "cash register" safe in the bedroom.[10] Along with the extensive drug paraphernalia, there were three guns in this house. Appellant was purportedly out on his appointed "drug delivery scheduling" rounds when he was arrested, but he did not have guns, drugs, or money with him. When the officers searched his house,[11] they found three weapons: a nine millimeter

---

9. *Id.* at 942.

10. That evidence included the discovery of: (1) several hundred small brown vials in the dining room and back room which were consistent with how phencyclidine or PCP is packaged for retail sale; (2) a Crown Royal bag, containing 2 Rolex watches, several rings, a couple of necklaces and other jewelry plus more than $11,000 in cash, stored in the bedroom safe along with appellant's I.D.; (3) 20 grams of crack cocaine, enough for "200 hits" at the retail level; (4) 150 grams of powdered cocaine, whereas 1/10 to 1/2 gram of cocaine suffices for a single personal consumption dose; (5) 3,387 grams of PCP, whereas 4 grams of PCP is consistent with a personal use amount. The cocaine by itself was purportedly worth $30,000 at the retail level.

11. Appellant's defense at trial was that, while this house might be a drug manufacturing and wholesale supply center, it was *not* his house and he was unconnected to either the drugs or the weapons. Instead, the house belonged to his mother, but it had been abandoned after a flood.

handgun loaded with two bullets, a twenty-two caliber pistol loaded with three bullets, both of which were found in the front bedroom, and an unloaded assault rifle in an undescribed location.

The jury could rationally find that appellant used those guns to facilitate his drug trafficking business under the "fortress theory" of a deadly weapon finding. Guns that are available to protect a drug trafficker's premises, should anyone attempt to steal the valuable product inside or disrupt the ongoing business operations, are "used" to facilitate the illicit drug enterprise.[12] It matters not whether the drug trafficker was actually on the premises or actively using the guns at the moment he is arrested or even seen. The king in his castle "uses" his turret cannons both when his soldiers fire them and when they sit for years awaiting a possible attack. He "uses" the halberds hanging in the hall both for a current war and to deter a future one. .

Unfortunately, many of our "guns and drugs" cases are not so clear-cut.[13] Thus, in determining the sufficiency of evidence to support a deadly weapon finding in these cases, Texas trial and appellate courts may, like the federal courts, rely on a number of different factors. These include:

12. *See, e.g., United States v. Head,* 927 F.2d 1361, 1366 (6th Cir.1991) (discussing the fortress theory and holding that "if it reasonably appears that firearms found on premises controlled or owned by defendant and in his actual or constructive possession are to be used to protect the drugs or to facilitate a drug transaction, then the firearms are 'used during and in relation' to a drug trafficking offense"); *United States v. McFadden,* 13 F.3d 463, 465 (1st Cir.1994) (concluding that the presence of a firearm for protection created a drug fortress; evidence that unloaded shotgun was found under defendant's mattress, together with undercover officer's marked buy money, more money, and $20 single packs of crack cocaine, sufficient to show use of a gun in relation to a drug trafficking crime, even though cocaine sale had taken place in apartment foyer, not bedroom); *United States v. Wesley,* 990 F.2d 360, 365 (8th Cir.1993) ("presence and ready availability of a firearm at a house where drugs are dealt" is sufficient to show use of firearm; defendant need not actually have weapon in hand, proximity of guns to drugs sufficient).

13. *Compare Wynn v. State,* 847 S.W.2d 357, 360–61 (Tex.App.—Houston [1st Dist.] 1993) (evidence insufficient to support deadly weapon finding when weapons found under a blanket in different bedroom from drugs and that bedroom did not appear to be defendant's bedroom even though evidence indicated that house was used for drug delivery operations), *aff'd on other grounds,* 864 S.W.2d 539 (Tex.Crim.App.1993), *with Gale v. State,* 998 S.W.2d 221, 224–26 (Tex.Crim. App.1999) (evidence supporting deadly weapon finding sufficient when unloaded firearms were found in bedroom closet and one was inside trash bag that contained 20 pounds of marijuana divided into smaller, retail packages); *Reyes v. State,* 906 S.W.2d 256, 258 (Tex.App.—Fort Worth 1995)(evidence sufficient for deadly weapon finding when unloaded pistol and shotgun were found in master bedroom, unloaded shotgun found in living room and ammunition was not located close by; no reference to amount or location of cocaine), *rev'd on other grounds,* 938 S.W.2d 718 (Tex.Crim.App.1996); *Crouch v. State,* 858 S.W.2d 599, 601 (Tex.App.—Fort Worth 1993) (evidence sufficient to support deadly weapon finding in illegal investment in drugs conviction even though defendant did not have pistol on him when he bought drugs; waiting in his car for drug buy to occur with loaded pistol on floorboard sufficed to show its use during commission of illegal investment offense). *See generally United States v. Ceballos–Torres,* 218 F.3d 409, 414 (5th Cir. 2000) (discussing but rejecting position that a "mere presence" or proximity test which "is one based on generality—anytime a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs. What is instead required is evidence more specific to the particular defendant, showing that his or her possession actually furthered the drug trafficking offense").

1) the type of gun involved; [14]

2) whether or not the gun was loaded; [15]

3) whether or not the gun was stolen; [16]

4) the proximity of the gun to the drugs, drug paraphernalia, or drug manufacturing materials; [17]

5) the accessibility of the gun to whomever controlled the premises; [18]

**14.** For example, automatic weapons or large-bore pistols are more likely connected to a drug transaction than a hunting rifle or shotgun. *See, e.g., Gale v. State,* 998 S.W.2d 221, 222–23 (Tex.Crim.App.1999) (guns found in closet with drugs included "one Ruger–Mini–14 rifle. . . an Uzi semi-automatic assault-type rifle, one nine-millimeter rifle, one nine millimeter handgun. . ."); *see also United States v. Moses* 289 F.3d 847, 851 (6th Cir.2002) (stating that possession of a .22 pistol is not "an uncommon weapon among those who commit drug offenses"); *United States v. Drozdowski,* 313 F.3d 819, 823 (3d Cir.2002) (noting that handguns "are more likely to be used in connection with a drug offense than long, hunting guns"); *United States v. Cantero,* 995 F.2d 1407, 1411 (7th Cir.1993) (noting that the handgun "is a 'tool of the [drug] trade' because it is easy to conceal yet deadly") (citation omitted); *United States v. Green,* 889 F.2d 187, 189 (8th Cir.1989)("[u]nlike the rifle in the hypothetical, however, guns like Green's are used only for personal protection"); *compare United States v. North,* 900 F.2d 131 (8th Cir.1990) (unloaded shotgun, antique cap and ball pistol, and inoperable .22 rifle found in drug defendant's son's bedroom did not qualify for firearm enhancement because: (1) the antique pistol was a nineteenth century model that required gun powder and lead balls; (2) the shotgun was an unloaded hunting gun belonging to the defendant's son; and (3) the .22 rifle was inoperable); *United States v. Hernandez,* 187 F.3d 806, 808–09 (8th Cir.1999) (trial court did not clearly err in finding that defendant's unloaded shotgun in truck's sleeping compartment was unconnected to his offense of transporting 300 pounds of marijuana in truck trailer).

**15.** *See Dimas v. State,* 987 S.W.2d 152, 154 (Tex.App.—Fort Worth 1999, pet ref'd) (loaded rifle found inches from cocaine); *Charles v. State,* 915 S.W.2d 238, 241 (Tex.App.—Beaumont 1996, pet. ref'd)(cocked and loaded pistol under sofa in same room as drugs); *see also Drozdowski,* 313 F.3d at 823 (although handguns were unloaded when found, one of them was stored in a case with its ammunition); *United States v. Starks,* 309 F.3d 1017, 1026–27 (7th Cir.2002) (upholding firearms enhancement when defendant was found within reach of a loaded gun and there was circumstantial evidence showing that he was aware of the presence of guns); *Moses,* 289 F.3d at 851 (considering various factors, including whether firearm was loaded, in determining whether a firearm was related to a particular drug offense).

**16.** *See United States v. Ceballos–Torres,* 218 F.3d 409, 415 (5th Cir.2000).

**17.** *See Moreno v. State,* 978 S.W.2d 285, 289 (Tex.App.—Fort Worth 1998, no pet.) (handgun and semi-automatic machine gun beside laundry basket with cocaine in it); *Sanchez v. State,* 906 S.W.2d 176, 181 (Tex.App.—Fort Worth 1995, pet. dism'd & ref'd) (Uzi and Ruger assault rifle found next to cocaine on closet shelf); *see also United States v. Noble,* 246 F.3d 946, 954 (7th Cir.2001) (sufficient nexus when firearm is found in a closet that is adjacent to room where drug proceeds were kept); *United States v. Eastland,* 989 F.2d 760, 770 (5th Cir.1993) (nexus between offense and weapon when "methamphetamine, currency, and paraphernalia" were stored in same location as guns). *Compare United States v. Zimmer,* 14 F.3d 286, 290–91 (6th Cir.1994) (when evidence established that defendant's rifles, found in living room and bathroom far from secret marijuana-growing room in basement, were used for hunting, there was no nexus between weapons and drug trafficking).

**18.** *See, e.g., Beal v. State,* 35 S.W.3d 677, 686 (Tex.App.—Houston [1st Dist.] 2000) (loaded handgun carried by co-defendant in car to drug buy), *rev'd on other grounds,* 91 S.W.3d 794 (Tex.Crim.App.2002); *Henton v. State,* 893 S.W.2d 165, 168–69 (Tex.App.—Houston [1st Dist.] 1995, no pet.) (defendant displayed gun at time officers entered apartment; cocaine found in next room); *Drozdowski,* 313 F.3d at 823–24 (collecting cases holding that evidence of guns which are secreted from view of casual visitors but are easily accessible to one who knew their hidden location support a nexus between use of guns to facilitate drug possession).

6) the quantity of drugs involved;[19] and

7) any evidence that might demonstrate an alternative purpose for the presence of the guns.[20]

In short, triers of fact and reviewing courts must look for some evidence showing that the particular defendant's actual or constructive possession of a deadly weapon did, in fact, further the drug trafficking operation.[21] Mere presence is not enough.[22] Proof showing simply the simultaneous possession of a gun and drugs does not suffice to establish, beyond a reasonable doubt, that the gun facilitated commission of the drug offense.

With these comments, I join the opinion of the Court.

---

19. For example, a driver who is found with a marijuana cigarette in one pocket and a gun in another pocket is much less likely to be using the gun to protect that lowly little cigarette than is the same driver who has 200 pounds of marijuana in the back of his truck.

20. For example, evidence that the guns were stored in a gun rack or cabinet, the presence of hunting trophies on the wall, testimony concerning hunting trips, etc. might raise an alternative, legitimate purpose for the gun possession. *See Moses*, 289 F.3d at 851 (absent any circumstantial evidence indicating that pistol was used only for hunting, such as testimony from any hunting companions, factfinder was not required to believe defendant's self-serving testimony that he used gun only for hunting raccoons).

21. *Ceballos–Torres*, 218 F.3d at 414.

