# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00132-CR

**Jimi Hofmann, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT NO. 9034177, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In January 2004, a jury found Jimi Hofmann guilty of the aggravated sexual assault of a child. Tex. Pen. Code Ann. § 22.021 (West Supp. 2004-05). Because Hofmann was HIV-positive, the jury found that his penis and bodily fluids were a deadly weapon used in the commission of sexual assault, an aggravating circumstance under the penal code. *Id*. § 22.021(a)(2)(A)(iv). Jimi Hoffman appeals the factual sufficiency of the State's evidence, contends that his penis and bodily fluids do not qualify under the law as a deadly weapon, and argues that the trial court improperly dismissed a juror that the State challenged for cause. We affirm the judgment of the district court.

**BACKGROUND**

A.K. was born in Germany on November 22, 1987, the daughter of Jimi Hofmann and Maria Pope. A.K. had a half-brother, C.H., the son of Jimi Hofmann and Monika Slauson. Jimi Hofmann's mother, Ruth Hofmann, lived in Texas, and his grandmother, Mary Kearns, lived in New Jersey. At the beginning of 2002, A.K., her mother Pope, and Pope's new husband were living in Georgia; C.H. and his mother Slauson were living in Germany; Ruth Hofmann was living in Austin; and Jimi Hofmann was living in Missouri with his terminally ill wife Patricia, whom he married in 1996. In 1992, Jimi Hofmann learned that he was infected with Human Immunodeficiency Virus (HIV); he testified that Patricia suffered from a number of medical problems, but was not HIV-positive.[1]

The events at the center of this case took place in 2002. That February, A.K. moved to Austin to live with her paternal grandmother, Ruth Hofmann, in her mobile home; in May, Jimi Hofmann and Patricia moved in as well. A.K. testified that at first, she was glad to see her father, since prior contact had been sporadic. She thought it was "cool" that he would share alcohol and marihuana with her. She became uncomfortable, though, as his hugs became more frequent; she also noticed him staring at her when she went swimming with her cousins.

At trial, A.K. described a camping trip with her father to Lake Travis where she said their first sexual encounter took place; Jimi Hofmann denied everything about her story except that they went camping. A.K. testified that after a day of swimming and fishing, her father gave her wine

---

[1] A.K., Pope, Slauson, and Slauson's second son with Jimi Hofmann have all tested negative for HIV.

coolers and marihuana and began kissing her on the neck and mouth. Inside their tent, he began removing her clothes. She said that Jimi Hofmann told her that he was not her real father and, because they were not related, anything that happened would be okay. She testified that once she was naked, her father gave her a "popper," which she described as "a chemical or something . . . that gives you a head rush when you inhale it." She further testified that he asked if she wanted to have sex, and she said yes; they then had unprotected sexual intercourse. The next day, they returned to Austin; A.K. told no one what happened.

Patricia died sometime after the camping trip; after that A.K. began occasionally spending the night in Jimi Hofmann's bedroom at Ruth Hofmann's house. Jimi Hofmann does not deny sharing a bed with his daughter "half a dozen times." A.K. accused Jimi Hofmann of having unprotected sex with her twice at her grandmother's and once more at a Travis County hotel after he gave her lingerie.

That October, A.K. and Jimi Hofman went to New Jersey to visit her paternal great-grandmother, Mary Kearns, and to see A.K.'s half-brother C.H. The family had planned for Jimi Hofmann and his two children to stay with Kearns; on their first night, he instead took his son and daughter to a hotel room. A.K. told the jury that she remembered the three of them drinking alcohol in the hotel room and playing a game, but could not recall what kind of game it was. She described a "flashback" memory of all three of them having sex, including the positions they assumed. She also testified that Jimi Hofmann again told her that he was not her father.

C.H. testified in greater detail about the incident in the New Jersey hotel. He described how the game they played—"truth or dare"—devolved into instances of escalating

3

sexuality, including A.K.'s revelation that she and her father had "been together," and Jimi Hofmann's daring C.H. to expose himself, which C.H. did. He said that his father and sister started "making out" and eventually asked him more than once to join them. C.H. testified that after initially resisting, he did attempt to have sex with A.K., but did not penetrate her. His description was consistent with A.K.'s account of the evening.[2]

Jimi Hofmann acknowledged taking his children to a hotel room their first night together in New Jersey; he testified that they went there because he didn't want to expose his grandmother to C.H.'s vulgar language and, because he thought they would be talking well into the night, his grandmother wouldn't be able to sleep. He testified that he bought alcohol, but only for himself and C.H. They discussed parentage once during the evening, Jimi Hofmann said; he told A.K. that a DNA test had established that C.H. was Jimi Hofmann's son, but that no test had ever established that he was A.K.'s father. As they were watching television and talking, Jimi Hofmann said that he fell asleep, only to be awakened later by C.H. and A.K. having sex. He says he immediately pulled his daughter off his son and put her in the shower to clean up.

Jimi Hofmann, A.K. and C.H. returned to Kearns's house the next morning. After their visit with her, A.K. and Jimi Hofmann returned to Texas; C.H. went home to Germany. The night C.H. returned, he told his grandparents about the New Jersey incident; together they told his mother Slauson. In November, A.K. and her mother Pope went to Germany to celebrate A.K.'s

---

[2] One notable divergence is C.H.'s description of a second night in a different hotel room. C.H. testified that while nothing sexual happened that night between the three of them, there was some time in which he was locked out of the room and no one answered when he knocked. When he was able to go back in, he noticed that A.K.'s pants were off.

4

fifteenth birthday. On that trip, Slauson informed Pope about the New Jersey incident. Pope confronted her daughter; after initially denying that anything had happened, A.K. told her mother about the incidents in New Jersey and on the camping trip and about the sexual encounters at Ruth Hofmann's house and at the hotel in Texas. After they returned from Germany, A.K. moved back to her mother's home in Alabama.

Pope notified the police, including the Travis County Sheriff's Office. That December, Jimi Hofmann was arrested and charged with aggravated sexual assault for the events that took place at the Travis County campground. He was convicted by a jury and sentenced to eighteen years in prison. He appeals that verdict.

## DISCUSSION

### Factual Sufficiency of the Evidence

Jimi Hofmann contends that the jury's verdict is contrary to the overwhelming weight of the evidence and therefore clearly unjust and wrong. When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference must be accorded to the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result if necessary to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The

5

evidence will be deemed factually insufficient to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85; *see Johnson*, 23 S.W.3d at 11.

On appeal, Jimi Hofmann specifically directs our attention to (1) the conflicts between his testimony and his children's, particularly the different stories about what happened in New Jersey; (2) the lack of specificity in A.K.'s descriptions of the events in Texas; (3) the State's failure to present corroborating evidence, noting that the lingerie allegedly given to A.K. was never produced; and (4) possible alternative reasons for his children to accuse him.[3] Applying the facts to the applicable standard of review, we find no reason to disturb the jury's verdict.

First, conflicts between the testimony of Jimi Hofmann, C.H., and A.K. are resolved by an evaluation of credibility and demeanor, which is best left to the finder of fact. *See Johnson*, 23 S.W.3d at 8 (citing *Cain v. State*, 958 S.W.2d 404 (Tex. Crim. App. 1997)). Any incompleteness in A.K.'s testimony likewise goes to her credibility and is a matter for the jury. The absence of the lingerie is explained by A.K.'s testimony that Jimi Hofmann kept the garment; other evidence corroborating the assault included Chuck Jones of the Travis County Sheriff's Department confirming that A.K.'s somewhat vague description of a campground matched a particular location on Lake Travis. Conjecture about alternative motives of Jimi Hofmann's accusers also goes to the weight and credibility of the evidence. We see no indication that the State's proof is too weak or that

---

[3] In his brief, Hofmann refers us to evidence disclosed by the State of a previous false outcry by A.K. that was never presented to the jury. Appellate courts do not consider evidence not before the jury when conducting a factual sufficiency analysis. *See Washington v. State*, 127 S.W.3d 197, 204 (Tex. App.—Houston [1st Dist.], 2003, pet. dism'd.) (citing *Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000)).

Jimi Hofmann's evidence too strong to support the jury's verdict; therefore, we find that the evidence is factually sufficient and overrule defendant's first point of error. *See Zuniga*, 144 S.W.3d at 484-85; *Johnson*, 23 S.W.3d at 11.

**Deadly Weapon**

The State charged Jimi Hofmann with aggravated sexual assault, alleging the use of a deadly weapon as the aggravating circumstance. Tex. Pen. Code Ann. §§ 1.07(a)(17)(B) (West Supp. 2004-05) ("'Deadly weapon' means . . . anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."), 22.021(a)(2)(A)(iv) ("uses or exhibits a deadly weapon"). Jimi Hofmann argues that the penis and bodily fluids of an HIV-positive man are legally insufficient to constitute a deadly weapon under the Texas Penal Code. Prosecution witness Robert Kaspar explained the nature of HIV and its transmission and linked the medical facts to the plain language of the statute. Jimi Hofmann made no attempt at trial, and makes no attempt now, to contradict Kaspar's testimony. He argues instead that the State's reading of the deadly weapon provision is unreasonably broad and that the legislature's only intent was to punish the use of violence in sexual assault, not to increase criminal penalties for the victims of a disease.

In *Najera v. State*, an HIV-positive defendant challenged his conviction for aggravated sexual assault, where the aggravating circumstance was the use of "a deadly weapon, to wit: his sexual organ and bodily fluids[.]" 955 S.W.2d 698, 700 (Tex. App.—Austin 1997, no pet.). We upheld the conviction, finding among other things that

7

the jury could rationally conclude beyond a reasonable doubt that he intentionally or knowingly used his penis and bodily fluids in a manner capable of causing death to [the victim] by infecting her with HIV.

*Id.* at 701. Unlike Jimi Hofmann, Najera did not argue that the bodily fluids of an HIV-infected man cannot be a deadly weapon but only that it should not have been found to be so in his particular circumstance. *Id.* at 700-01. Our positive answer to that narrow question implicitly recognized that the fluids of a man infected with HIV may legally be classified as a deadly weapon. We note that the court of criminal appeals has recently found that other nonviolent items may satisfy the deadly weapon standard by the manner in which they are used. *See Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002) (holding that unloaded BB gun met definition of deadly weapon).[4] In

---

[4] In a concurring opinion in *Adame*, Judge Meyers described the spectrum of potential deadly weapons:

> [O]bjects that are generally not considered dangerous as such may become so by virtue of the manner in which they are used in the offense. *Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991) (automobiles, telephone cords, bathwater, feather pillows, golf clubs, shanks); *Crutcher v. State*, 969 S.W.2d 543, 546 (Tex. App.—Texarkana 1998, pet. ref'd) (flashlight); *Sellers v. State*, 961 S.W.2d 340, 352 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (fire); *Davis v. State*, 955 S.W.2d 340, 352 (Tex. App.—Fort Worth 1997, pet. ref'd) (mixture of sedatives); . . . *Powell v. State*, 939 S.W.2d 713, 717 (Tex. App.—El Paso 1997, no pet.) (feet); *Morales v. State*, 792 S.W.2d 789, 790 (Tex. App.—Houston [1st Dist.] 1990, no pet.) (hands and underpants); *Cooper v. State*, 773 S.W.2d 749, 750 (Tex. App.—Corpus Christi 1989, no pet.) (hands); *Compton v. State*, 759 S.W.2d 503, 504 (Tex. App.—Dallas 1988, no pet.) (broken bottle).

*Adame v. State*, 69 S.W.3d 581, 584 (Tex. Crim. App. 2002) (Meyers, J., concurring). *See also Coleman v. State*, 145 S.W.3d 649, 655-56 (Tex. Crim. App. 2004) (Cochran, J., concurring) (describing "Big Bang" theory, in which the deadly weapons definition "has fallen prey to 'mission creep' into areas unforeseen and probably unintended by the Legislature[,]" but also arguing that it is the legislature's place to fix any overly broad application of the statute).

addition, we may only look beyond the plain, unambiguous meaning of the statute if such a reading would produce absurd results. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). Based on Kaspar's uncontradicted testimony about the nature and transmission of HIV, the jury could find facts that fit the plain statutory definition of "deadly weapon." Furthermore, it is not absurd for the State to mete out greater punishment to sexual perpetrators who knowingly expose their victims to this deadly virus. Direct precedent of this Court and the court of criminal appeals and a plain reading of the statute compel us to deny the second point of error.

**Challenge for Cause**

Juror number two admitted during voir dire that there had been an occurrence of incest in her family; she said her feelings about the issue would likely weigh against the defense. The State challenged juror number two for cause and the judge granted the challenge. Based on article 35.16 of the code of criminal procedure, Jimi Hofmann argues that, because juror number two's bias was against him, he had the right to waive the basis of the challenge for cause and that it was error for the judge not to seat juror number two. Article 35.16 lists a number of grounds justifying a challenge for cause, then adds that certain grounds may not be waived but that the remaining grounds—including bias or prejudice—"may be waived by the party or parties in whose favor such grounds of challenge exist." Tex. Code Crim. Proc. Ann. art. 35.16(a) (West 1989).

We need not address this issue because, even if the grant of the State's challenge to juror number two was error, Jimi Hofmann has not demonstrated any harm. "[E]rroneous excusing of a veniremember will call for reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury." *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998); *see*

9

*also Collum v. State*, 96 S.W.3d 361, 366 (Tex. App.—Austin 2002, no pet.). There is no right to have any particular person sit on the jury. *Ford v. State*, 73 S.W.3d 923, 926 (Tex. Crim. App. 2002) (citing *Jones*, 982 S.W.2d at 393). Jimi Hofmann pointed to nothing in the record which would indicate that the jury in this case was not lawfully constituted; therefore, even if the trial judge's dismissal of juror number two was erroneous, we uphold the jury's verdict.[5]

## CONCLUSION

Having overruled Jimi Hofmann's three points of error, we affirm the judgment of conviction.

_____
Bea Ann Smith, Justice

_____

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: July 8, 2005

Do Not Publish

---

[5] Our sister court in Fort Worth has noted that since *Jones*, no case has held that an erroneous grant of a State's challenge for cause has required reversal. *Moore v. State*, 54 S.W.3d 529, 538 (Tex. App.—Fort Worth 2001, no pet.).