**Affirmed as Modified and Opinion filed October 1, 2013.**



**In the**

# Fourteenth Court of Appeals

---

### NO. 14-12-00623-CR

---

### DAMIAN RICARDO FLORES, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1242919**

---

### O P I N I O N

Appellant Damian Ricardo Flores was convicted by a jury of possession of cocaine weighing more than 4 and less than 200 grams. The jury answered a deadly weapon special issue in the affirmative. The jury sentenced him to 20 years' confinement. On appeal, he presents four issues: (1) whether the evidence is legally sufficient (a) to support his conviction for cocaine possession and (b) to support the jury's deadly weapon finding; (2) whether the trial court committed charge error by refusing appellant's requested deadly weapon instruction; (3) whether during appellant's

punishment phase the trial court erred in allowing testimony regarding his alleged involvement in a previous shooting; and (4) whether the court costs imposed against him are supported by sufficient evidence. We sustain appellant's fourth issue. Finding no reversible error in his remaining issues, we modify the trial court's judgment to delete the specific amount of court costs, and affirm the judgment as modified.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Appellant was indicted for felony possession with intent to deliver a controlled substance, namely, cocaine, weighing at least 4 and less than 200 grams, including any adulterants and dilutants, alleged to have been committed on or about November 30, 2009.

At trial, Officer Vanderberry, a narcotics investigator representing the Houston Police Department (HPD) as part of a multi-agency drug trafficking task force, testified that he was conducting initial surveillance on a residence on Sarita Street on the afternoon of November 30, 2009. Vanderberry observed a number of hand-to-hand transactions between individuals coming up to the front door and a male inside the residence, identified as appellant. Based on his observations and experience in drug trafficking, Vanderberry mobilized a team, which included Sergeant Ohland with the Texas Department of Public Safety, returned to Sarita Street, and set up surveillance.

Ohland and Vanderberry observed a black Dodge Magnum containing appellant and a woman drive up to the residence. Appellant entered the residence using a key, and the woman drove away. About one hour later, a couple approached the residence on foot. The male knocked on the door, appellant answered, the male handed something to appellant, appellant closed the door and returned in a minute or so, appellant handed something to the male, and the male put the item in his pocket. Ohland followed, stopped, and detained the couple; the male was found with a baggy of marijuana in his pocket.

2

Vanderberry continued his surveillance.  About half an hour later, appellant exited the residence, locked the front door, and drove off in a Lincoln SUV.  Vanderberry observed appellant commit multiple traffic violations, and radioed for a marked police car to conduct a stop.  Police recovered a set of keys from appellant,[1] a Santa Muerte medallion, and about $600 in cash.  Santa Muerte is known as the patron saint of narcotics traffickers.

Police obtained a search warrant for the Sarita Street residence and used appellant's key to enter.  No one had entered the residence since appellant left, and no one was inside when the search warrant was executed.  In the kitchen, there was a tray containing loose marijuana on a countertop.  Police recovered from kitchen drawers several large baggies containing marijuana, a large baggy containing cocaine, and Xanax prescription pills.  The cocaine weighed 8.8 grams.  Also in the kitchen were smaller "sandwich-type" baggies, a digital scale, and a fake drink canister of the type used to smuggle narcotics.  In the living room, on the end table by the sofa, was a loaded 9-millimeter semiautomatic pistol with an "obliterated" serial number.  This pistol was located approximately 15 feet from the front door, and its hammer was "cocked back."  Also in the living room were framed photos of appellant and his wife, and a shrine to Santa Muerte.  In the guest bedroom, police located a manila folder filled with various documents containing appellant's name.[2]  In the master bedroom, in a drawer, police located a loaded .38-caliber pistol, various pistol magazines, and a high-powered rifle magazine.

At trial, appellant objected to the language of the deadly weapon special instruction, and the trial court denied the proposed charge.  The jury convicted appellant

---

[1] Appellant's key chain also depicted Santa Muerte.

[2] The folder contained appellant's driver's license, legal documents and court papers, paystubs, money orders, invoices, receipts, correspondence, and license plates.  These documents contained various addresses for appellant, but did not include the Sarita Street address.

3

of possession of a controlled substance, namely, cocaine, weighing more than 4 and less than 200 grams. The jury also found beyond a reasonable doubt that appellant used or exhibited a deadly weapon, namely, a firearm, during the commission of the offense.

During the punishment phase, appellant moved to exclude any testimony from Yvonne Stern and requested that the trial court "make a threshold inquiry as to the admissibility of her testimony." Appellant also objected that the testimony was "highly prejudicial." The trial court stated that she "was the trial court Judge that presided over the—Mr. Flores' previous trial regarding the attempted capital murder charge" and so was "aware of the evidence that was presented." The trial court denied the motion.

Stern testified about an incident occurring on the morning of May 5, 2010. Stern was walking to her car in the parking garage of her apartment complex[3] when a Hispanic man "charged" at her and pointed a gun at her. Stern jumped into her car, but the man continued to approach her. He pointed a gun at her head and demanded that she exit the car and give him money. Stern did not have any money, and the man started walking away, but then turned around and shot her in the stomach. Stern initially identified another Hispanic man as the shooter but ultimately identified appellant in a live line-up.

At the conclusion of the punishment hearing, the jury sentenced appellant to 20 years' confinement.

On appeal, appellant argues: (1) the legal insufficiency of the evidence (a) to support his conviction for cocaine possession and (b) to support the jury's deadly weapon finding; (2) the trial court committed charge error by refusing his requested deadly weapon instruction; (3) the trial court erred by allowing Stern's testimony during punishment; and (4) the insufficiency of the evidence to support the court costs imposed

---

[3] Stern and her family had moved to this complex after two previous shooting incidents at their Bellaire home. Appellant was not involved in these other shootings.

in his judgment.

## II.    ANALYSIS

## A. Appellant's legal insufficiency issue

In his first issue, in two subparts, appellant challenges the legal sufficiency of the evidence to support (1) the jury's guilty verdict on cocaine possession and (2) the jury's finding that appellant used or exhibited a deadly weapon during commission of the offense.  We conclude that the evidence is legally sufficient to support both appellant's conviction and the deadly weapon special issue.

### 1.  Standard of review

When evaluating the legal sufficiency of the evidence, we "consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt."  *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).  We presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.  *See Jackson*, 443 U.S. at 326.  We also defer to the factfinder's evaluation of the credibility and weight of the evidence.  *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).  In a challenge to the legal sufficiency of the evidence, our role "is restricted to guarding against the rare occurrence when a factfinder does not act rationally."  *Id.* (quoting *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009)).

### 2.  "Links" to cocaine

Appellant first argues that the evidence is legally insufficient to support his conviction for cocaine possession because the evidence does not affirmatively link him to the cocaine.

5

A person commits an offense if he knowingly or intentionally possesses over 4 but less than 200 grams of cocaine, including any adulterants or dilutants. TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D), 481.115(a), (d) (West 2010). To prove the unlawful possession of a controlled substance, the State must establish that the accused (1) exercised care, control, custody, or management over the contraband and (2) knew that the substance possessed was contraband. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005). Possession may be proved through either direct or circumstantial evidence. *Id.* at 405–06.

"When the accused is not in exclusive possession of the place where the contraband was found, it can not be concluded that appellant had knowledge of or control over the contraband unless there are additional independent facts and circumstances that affirmatively link appellant to the contraband." *Avila v. State*, 15 S.W.3d 568, 573 (Tex. App.—Houston [14th Dist.] 2000, no pet.). "Links" are established when the evidence shows that the accused's connection with the contraband was more than just fortuitous. *Poindexter*, 153 S.W.3d at 405–06. "We consider the totality of the circumstances when determining whether the accused is linked to the recovered contraband." *Roberts v. State*, 321 S.W.3d 545, 549 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Mere presence at the scene where contraband is found does not establish possession; "[h]owever, presence or proximity, when combined with other evidence, either direct or circumstantial (e.g., 'links'), may well be sufficient to establish that element [of actual care, custody, or control] beyond a reasonable doubt." *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006). We have identified a nonexhaustive list of potential links that, individually or in combination, may establish the accused's possession of contraband:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view[;] (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the

6

influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Olivarez v. State*, 171 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2005, no pet.), *cited in Evans*, 202 S.W.3d at 162 n.12. The number of links present is not dispositive; establishing possession depends on the logical force created by all the evidence. *Evans*, 202 S.W.3d at 162. In addition, "[t]he absence of various links does not constitute evidence of innocence to be weighed against the links present." *Satchell v. State*, 321 S.W.3d 127, 134 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Hernandez v. State*, 538 S.W.2d 127, 131 (Tex. Crim. App. 1976)).

Here, appellant asserts that (1) he was not at the residence when the search was conducted. However, continuous surveillance for several hours and the fact that no one else was present in the house when police executed the warrant indicate appellant had been the only person present in the residence. Further, during that period of surveillance, police observed him enter the residence with a key; respond to individuals knocking on the front door; not allow those individuals entry; and then engage in a suspected, then subsequently confirmed, drug transaction. This factor thus weighs in favor of a link. *See Lair v. State*, 265 S.W.3d 580, 587 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (testimony that hand-to-hand transaction occurring in defendant's presence in vehicle he was driving provided sufficient link between defendant and drugs later seized from car to demonstrate possession, despite argument that drugs belonged to another vehicle occupant).

7

Appellant next contends that (2) the cocaine was hidden, so it was not in plain view. This is consistent with the officers' testimony that the baggy of cocaine was located inside a kitchen drawer. This factor does not tend to favor a link.

Although appellant acknowledges he was in the residence where marijuana was in plain view, with regard to his proximity and accessibility to the cocaine, he argues that (3) he was not the only person in there and it was not his residence. However, the evidence indicates that appellant was the only individual in the residence for, at the least, the last few hours prior to the search, and that he was moving about the residence freely. A loose tray of marijuana was out in the open on the kitchen counter. In addition to the cocaine baggy, the kitchen drawers contained Xanax pills and large baggies of marijuana. Also located in the kitchen were a scale, sandwich-type baggies consistent with trafficking, and a fake drink canister for secreting narcotics. And appellant was observed providing a suspected buyer with a small item that police confirmed as an individual baggy of marijuana. Based on appellant's ease of movement throughout the house, which reasonably included the kitchen, a rational jury could have inferred that appellant was in close proximity to and could access the cocaine. This factor also favors a link.

We agree with appellant that the next few factors do not appear to link him to the cocaine, that is: (4) he was not under the influence of any drugs when arrested, (5) he did not possess other contraband or narcotics when arrested, (6) there was no evidence at the guilt/innocence phase that he made incriminating statements when arrested, (7) there was no evidence that he attempted to flee, and (8) there was no evidence that he made furtive gestures. Although appellant next contends that (9) no odor of the cocaine was ever mentioned, Vanderberry testified that marijuana is "so pungent" whereas someone cannot "smell [cocaine] when you walk up to it." Here, where there is evidence that the contraband at issue has no odor, this factor appears to be neutral.

8

Factor (10) is whether other contraband or drug paraphernalia were present. Here, several large baggies of marijuana, a tray containing loose marijuana, and a bottle "with the label removed" containing Xanax prescription pills also were recovered from the residence. Also present were a digital scale used "to measure out your narcotics," "individual baggies that are used for sale," and the fake drink container for secreting narcotics. This factor favors a link.

Next, appellant argues that (11) he did not own the residence nor was there any documentation of his leasing it. In support of this, appellant points to the lack of utility bills in his name, no mail tying him to the Sarita Street address, and nothing tying him instead of his male cousin[4] to the men's clothing located at the residence. Appellant insists that under three hours of surveillance, "old papers" with appellant's name on them, appellant's having a key to the residence, and the pictures of appellant at the residence are not sufficient to establish appellant's care and control over the residence. While appellant characterized the papers located in the guest room closet as "old," some were dated as late as July 2009. Moreover, according to police, "important documents such as divorce decrees and license plate information," "documents that are close and personal," are "going to be kept in a location that you have access to if it is your residence."[5] Police also offered explanations for why the documents did not contain the Sarita Street address: to "throw off law enforcement," protect against home invasion, and that it is "common business practice" to "keep[] your family in one location and hav[e] your drug house in another." *See Utomi v. State*, 243 S.W.3d 75, 80 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (officer "explained that very few drug dealers sell drugs out of their own house or apartment, but rather sell out of a house or

---

[4] Two of appellant's brothers testified that one of their cousins and that cousin's brother or brothers lived at the Sarita Street residence in November 2009.

[5] One of appellant's brothers stated he once stayed at the Sarita Street residence for "months," and acknowledged he kept his "important documents" at the residence only "[w]hen [he] was staying there" and then "took it [sic] with [him]."

apartment in someone else's name"). The photographs of appellant and his wife "displayed prominently" in the living room tend to indicate that he was using Sarita Street as a residence—and there were no displayed photos of anyone else. *See Poindexter*, 153 S.W.3d at 411 (considering recovered photo of appellant as evidence he lived at house); *Herrera v. State*, 561 S.W.2d 175, 179 (Tex. Crim. App. 1978) (same). Appellant's possession and use of a key to gain entry and to lock up when exiting also connect him to the residence. *See, e.g., Hubert v. State*, 312 S.W.3d 687, 691 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Coleman v. State*, 113 S.W.3d 496, 501 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 145 S.W.3d 649 (Tex. Crim. App. 2004), for holding that "appellant having a key to the house is a link"); *Ettipio v. State*, 794 S.W.2d 871, 874 (Tex. App.—Houston [14th Dist.] 1990, pet. dism'd) (apartment key and access card); *Garcia v. State*, 753 S.W.2d 187, 188 (Tex. App.—San Antonio 1988, pet. ref'd) (motel room key). Finally, while the period of police surveillance may have spanned only a few hours, during that time, appellant was the only individual observed at the residence—he entered by the front door with a key, responded to a couple knocking at the front door, did not allow the couple to enter, then engaged in a confirmed drug transaction. Based on this evidence, a rational jury reasonably could have inferred that appellant enjoyed the right of possession with regard to the residence. This factor favors a link.

Appellant further argues that even assuming he had joint possession of the residence with his cousin, the evidence is not enough to link him to and establish his awareness of possession of the cocaine. Appellant relies on *Medina v. State* and *Allen v. State*, where the appellate courts determined that the evidence was insufficient to link the appellant to possession of the contraband. Neither case is binding on this court and both cases are distinguishable. In *Medina*, the appellant had not been inside the residence during the five-hour period of surveillance that day—and the other woman

10

who lived there was present during the search. —S.W.3d—, No. 01-10-01134-CR, 2011 WL 6013094, at *5 (Tex. App.—Houston [1st Dist.] Dec. 1, 2011, pet. ref'd). Further, while the appellant had been observed engaging in hand-to-hand suspected drug transactions during previous surveillance on the residence, those transactions were unconfirmed and no transactions took place on the date of the offense. *Id.* at *6. In *Allen*, there was no evidence that the appellant, who sometimes babysat the owner's child, lived at the apartment. 249 S.W.3d 680, 697–98 (Tex. App.—Austin 2008, no pet.). Nor was there any showing that the appellant had been in the kitchen where the contraband was located[6]; and it was the owner of the apartment, not the appellant, who had been under police surveillance. *Id.* at 695, 697.

Appellant acknowledges that (12) the cocaine was located in an enclosed space, a closed kitchen drawer. Thus, this factor supports a link. Appellant also acknowledges that (13) he was found with $600 in cash on him, which Vanderberry stated was consistent with drug dealing. This factor also supports a link. Finally, we agree with appellant that (14) there was no evidence adduced at guilt/innocence of any consciousness of guilt.

While the numbers of links present is not dispositive, almost half of the factors indicate that appellant's connection to the cocaine was more than just fortuity here. *See Evans*, 202 S.W.3d at 161–62. Considering the totality of the circumstances, and that

---

[6] Appellant emphasizes that the *Allen* court found insufficient evidence "despite the fact that the defendant's fingerprints were found on the plate containing cocaine." There were several reasons the *Allen* court could have discounted the appellant's link to this particular location of cocaine. The "lion's share" of the cocaine (approximately 246 of the 253 total grams) was found elsewhere in the kitchen; the appellant's fingerprints were located only on the underside of the ceramic platter at issue; the owner's fingerprints were also located on the platter; the platter was found on the back of the top of the refrigerator; there was evidence appellant had brought the owner "some pots" and utensils when he moved in because he did not own any; there was expert testimony that fingerprints on ceramic could last for years; and the police only arrested the appellant three months after the search when her fingerprints were found. *See* 249 S.W.3d at 684–87, 694–97. Here, the police explained that due to the strength of the case, they made a judgment call not to submit items for fingerprinting.

"[i]n deciding whether the evidence is sufficient to link the defendant to contraband, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony,"[7] we conclude that the links established by the logical force of this evidence are sufficient to support a finding that appellant knowingly possessed cocaine weighing at least 4 but less than 200 grams. Further, after considering all the evidence in the light most favorable to the verdict, we have determined that, based on that evidence and reasonable inferences therefrom, a rational jury could have found appellant guilty of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19.

### 3. Deadly weapon finding

As a subpart to his legal insufficiency issue, appellant argues the State failed to show that he "ever handled, possessed, or 'used' the deadly weapon in the facilitation of the offense."

A deadly weapon finding can be made if a deadly weapon "was used or exhibited during the commission of a felony offense or during immediate flight therefrom." TEX. CODE CRIM. PROC. ANN. art. 42.12 § 3g(a)(2) (West 2006 & Supp. 2012). The deadly weapon finding is important in that it affects a defendant's eligibility for parole. *Coleman*, 145 S.W.3d at 652. The parties do not dispute that appellant did not exhibit a deadly weapon.[8] Nor do the parties dispute that deadly weapons, namely, firearms, were recovered during the search. *See* TEX. PEN. CODE ANN. § 1.07(a)(17)(A) (West 2011 & Supp. 2012). Thus, we must determine whether a rational trier of fact could have found beyond a reasonable doubt that appellant used a firearm to facilitate possession of the cocaine. *See Coleman*, 145 S.W.3d at 652. In the context of a deadly

---

[7] *Poindexter*, 153 S.W.3d at 406.

[8] The term "exhibit" requires that the deadly weapon be "consciously shown, displayed, or presented to be viewed." *Coleman*, 145 S.W.3d at 652 (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989) (en banc)).

weapon finding, the term "use" means "*any* employment of a deadly weapon, even [its] simple possession, if such possession facilitates the associated felony." *Id.* (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989) (en banc)). Thus, the real question is whether any of the weapons recovered are found to have facilitated appellant's possession of the cocaine also found at the Sarita Street residence. *See Coleman*, 145 S.W.3d at 655.

Appellant argues that because he did not own the residence, was never seen with a gun, and no fingerprint analysis was conducted, there is insufficient evidence to establish that he used weapons in facilitation of the offense. Appellant also points to the concurring opinion in *Coleman*, which expressed concern that "[t]he use of deadly weapon findings has grown out of all bounds." 145 S.W.3d at 656 (Cochran, J., concurring).[9] However, based on our review of the evidence and the case law, we conclude a rational jury could have found beyond a reasonable doubt that appellant used a firearm to facilitate his possession of the cocaine.

In *Patterson*, the jury convicted the appellant of possession of methamphetamine and affirmatively answered a deadly weapon question. 769 S.W.2d at 939. The appellant argued there was no evidence of a threat involving the gun at issue, and if the gun facilitated possession of anything, it was only his $905 in cash. *Id.* at 940. In upholding the deadly weapon finding, the *Patterson* court concluded while it could be true he was using the gun to protect his cash, "it does not mean that the weapon had no utility to his protection of the drugs." *Id.* at 942.

---

[9] Appellant does not ask us to apply nor does he provide any analysis of the factors from the concurring opinion in *Coleman*. *See* 145 S.W.3d at 659–60 (Cochran, J., concurring) (listing factors as (1) the type of gun involved; (2) whether the gun was loaded; (3) whether the gun was stolen; (4) the proximity of the gun to the drugs, drug paraphernalia, or drug manufacturing materials; (5) the accessibility of the gun to whomever controlled the premises; (6) the quantity of drugs involved; and (7) any evidence that might demonstrate an alternative purpose for the presence of the guns). We have not located any case where this court has applied the *Coleman* concurrence factors, and we do not apply them here.

In *Gale v. State*, the appellant argued there was no evidence that the unloaded firearms stored in a closet were "used" in connection with the offense of marijuana possession. 998 S.W.2d 221, 224 (Tex. Crim. App. 1999). In upholding the deadly weapon finding, the *Gale* court noted there was uncontroverted trial testimony "that drug traffickers use firearms to protect their drugs and drug proceeds." *Id.* at 225. The court noted that the closet also contained ammunition for the firearms, "distribution-sized packages" of marijuana, and cash: "This is not a case where a person's weapons are found in a gun cabinet or closet completely separate from the criminal enterprise." *Id.* at 225–26.

More recently, in *Coleman*, the court upheld separate deadly weapon findings where the appellant was convicted of possession with intent to deliver cocaine and of possession with intent to deliver PCP. 145 S.W.3d at 649–50. There, in relevant part, appellant argued that at the time of the search he was detained in a patrol car so he had no access to the guns, there was no evidence his fingerprints were on the guns or they were registered in his name, the weapons were not located in close proximity to the drugs, and there was no evidence of his actual physical possession or control of the guns. *Id.* at 651–52. The court disagreed, concluding "the jury could have reasonably believed that the guns protected or facilitated Appellant's possession of the drugs with intent to deliver." *Id.* at 652–55 (discussing *Patterson* and *Gale*).

The evidence indicates that the living room and the kitchen were next to each other in the front of the house. In the kitchen, police recovered loose marijuana in plain view. In side-by-side kitchen drawers, police recovered large baggies of marijuana, Xanax pills, and a baggy containing 8.8 grams of cocaine, which Vanderberry testified was an "amount more than just for personal use." In plain view in the living room, on the end table next to the sofa, police recovered a 9-millimeter semiautomatic pistol,

which was loaded and "cocked back."[10] This pistol was located about 15 feet from the front door. Vanderberry testified that this firearm was a deadly weapon. He testified that drug dealing was a "very dangerous" business. He also testified that dealers face serious threats of targeted home invasion and, as a result, "try to protect their business interest." *See Castillo v. State*, —S.W.3d—, No. 01-11-00365-CR, 2012 WL 2924469, at *3 (Tex. App.—Houston [1st Dist.] July 12, 2012, no pet.) (officers "testified that it is common for drug traffickers to keep weapons to protect themselves and their drugs and cash"); *see also Gale*, 998 S.W.2d at 225; *Patterson*, 769 S.W.2d at 942.

Appellant did not cite, and we have not located, any authority that requires appellant be seen with a gun in order to "use" it. Vanderberry testified that the 9-millimeter gun located in plain view caused police "concern" as soon as they entered the residence to execute the warrant. The "cocked back and ready" gun was located 15 feet from the front door. A rational jury reasonably could have concluded that this pistol in the living room was accessible to appellant while he moved freely throughout the residence, including to and from the front door and the kitchen, where the cocaine was kept. *See Newby v. State*, 169 S.W.3d 413, 415–16 (Tex. App.—Texarkana 2005, pet. ref'd) (upholding deadly weapon finding in marijuana possession case where testimony indicated appellant came within "ten steps" of rifle). Moreover, courts have upheld deadly weapon findings where the gun was located in a different room from the contraband. *See id.* at 414–16 (assault rifle at issue was located on the bed in bedroom, while dried marijuana was located in living room and an outbuilding, and live marijuana plants were found growing in outdoor flower beds); *see also Coleman*, 145 S.W.3d at 650–51, 655 (pistol and rifle were located in bedroom "with the bed," while crack cocaine was found in kitchen and cocaine was found in dining room); *Sanchez v. State*, 243 S.W.3d 57, 61, 73–74 (nine firearms located in bedroom next to living room, where

---

[10] Vanderberry explained that all one had to do to fire the pistol was "drop the safety and pull the trigger."

15

"the majority of the cocaine was found," were likely used to "protect their dope"). Nor is evidence of fingerprints or ownership "necessary to a finding that a person used a deadly weapon in violation of article 42.12." *See Castillo*, —S.W.3d—, 2012 WL 2924469, at *3 (rejecting argument that State did not establish ownership of gun).

Viewing the evidence in the light most favorable to the challenged finding, we conclude a rational jury could have concluded beyond a reasonable doubt that appellant's possession of the loaded 9-millimeter pistol[11] in the living room, next to the kitchen where the drugs were kept, and within 15 feet of the front door, facilitated his possession of the cocaine inside the residence. *See Coleman*, 145 S.W.3d at 652. Thus, we overrule appellant's first issue.

## B. Appellant's jury charge issue

In his second issue, appellant argues that the trial court erred by refusing his requested jury instruction on the deadly weapon special issue. He contends that his proposed instruction was "absolutely necessary for the jury to understand the law and reach a proper verdict." We conclude that no error existed in the jury charge.

### 1. Standard of review

"Appellate review of purported error in a jury charge involves a two-step process." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). We first determine whether there is error in the jury instruction. *Id.* (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). Then, if error is found, we must analyze that error for harm. *Id.* (citing *Middleton*, 125 S.W.3d at 453).

---

[11] Having found the evidence legally sufficient with respect to the 9-millimeter semiautomatic pistol recovered from the living room, we do not reach whether the jury reasonably could have concluded that the .38-caliber pistol recovered from the master bedroom also supported the deadly weapon finding. *See* TEX. R. APP. P. 47.1.

## 2. The trial court's jury charge

Appellant's indictment alleged that at the time appellant committed the charged offense on or about November 30, 2009, he used and exhibited[12] a deadly weapon, namely, a firearm, during the commission of and immediate flight therefrom. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12 § 3g(a)(2). The following instruction was submitted in the special issue charge:

> Now, if you have found the defendant guilty of either offense hereinabove defined,[13] you must determine beyond a reasonable doubt whether or not he used or exhibited a deadly weapon, namely, a firearm, during the commission of the offense or during the immediate flight therefrom.

Appellant objected to the special issue instruction and requested that the court instruct the jury:

> In order to find that Mr. Flores used or exhibited the firearm, the prosecution must show that the deadly weapon was used or exhibited the weapon [sic] in a manner that facilitated the felony conduct.

Appellant acknowledged that the instruction tracked article 42.12, section 3g(a)(2), but insisted that the instruction also "include other language that helps the jury make a proper decision in this case." The State responded that the "facilitation" language requested by appellant was not required and instead is used in evaluating the sufficiency of the evidence. The trial court denied appellant's request.

## 3. There was no error in the instruction.

The trial court must provide the jury with "a written charge distinctly setting forth

---

[12] When an indictment alleges an offense in the conjunctive, as with the use of the word "and," it is proper to charge the jury in the disjunctive form by using the word "or." *White v. State*, 874 S.W.2d 229, 232 (Tex. App.—Houston [14th Dist.] 1994, pet. dism'd) (citing *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)).

[13] Prior to the special issue, the guilt-innocence charge permitted the jury to choose among finding appellant not guilty, finding him guilty of the offense of possession of cocaine with intent to deliver, or finding him guilty of the offense of possession of cocaine.

the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). But the trial court may not express "any opinion as to the weight of the evidence." *Id.*; *Walters v. State*, 247 S.W.3d 204, 208 (Tex. Crim. App. 2007). The Court of Criminal appeals has "held that, if a jury instruction is derived from the penal code, it is generally permitted because it is the applicable statute and, therefore, the 'applicable law,' as required by Article 36.14." *Celis v. State*, —S.W.3d—, 2013 WL 2373114, at *10 (Tex. Crim. App. May 15, 2013) (citing *Kirsch*, 357 S.W.3d at 651). While courts must instruct on statutorily defined terms, "[b]y contrast, it is generally impermissible to instruct on terms not statutorily defined, and the trial court instead must permit the jury to construe them according to the rules of grammar and common usage." *Id.* at *11.

For example, in *Kirsch*, the Court of Criminal Appeals concluded that the trial court's inclusion of a definition for the term "operate" in a DWI instruction, even though the court's chosen definition reflected "an appropriate definition for an appellate court to apply in assessing the sufficiency of the evidence to support the 'operate' element" under the DWI statute, was error. 357 S.W.3d at 652; *see id.* at 651 ("Although an appellate court may articulate a definition of a statutorily undefined, common term in assessing the sufficiency of the evidence on appellate review, a trial court's inclusion of that definition in a jury charge may constitute an improper comment on the weight of the evidence."). The *Kirsch* court thus cautioned against courts improperly commenting on the weight of the evidence by including special, nonstatutory instructions because juries should be "free to 'consider and evaluate the evidence in whatever way they consider it relevant to the statutory offenses.'" *Id.* at 651–52 (quoting *Walters*, 247 S.W.3d at 211).

Appellant argues a jury charge that does not reflect his requested language runs afoul of *Patterson*, and here confused the jury and allowed it to convict him despite the

lack of evidence of facilitation.[14]  We agree that the *Patterson* court construed the meaning of "use" within article 42.12, section 3g(a)(2), and concluded that it "refers certainly to the wielding of a firearm with effect, but extends as well to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony."  769 S.W.2d at 941.  However, the court did not assign any technical meaning to the term "use," but instead read the statutory term in context and construed it in accordance with the rules of ordinary grammar and usage, in the context of a sufficiency challenge.  *See id.* at 940–41 (citing TEX. GOV'T CODE § 311.011).

While *Patterson*'s definition of the common term "use" is instructive for purposes of legal sufficiency review of a deadly weapon finding, instructing the jurors regarding that definition arguably may "impermissibly guide[] their understanding on the term" and "improperly impinge[] on the jury's fact-finding authority by limiting the jurors' understanding of what evidence could constitute" "use."  *See Kirsch*, 357 S.W.3d at 652; *Ex parte Thomas*, 638 S.W.2d 905, 907 (Tex. Crim. App. 1982) ("[W]hether a firearm was used in the commission of an offense, etc., is a fact issue to be decided by the trier of the facts.").  Applying *Kirsch*, we cannot agree *Patterson* and its progeny require that the jury be instructed on facilitation.  Therefore, we conclude that the trial court committed no error by refusing appellant's requested deadly weapon instruction.  Thus, we overrule appellant's second issue.

---

[14] Appellant further points to a suggested definition included in commentary to the Texas Criminal Pattern Jury Charges: "A person's mere possession of a deadly weapon, if the person intends this possession to facilitate the felony or escape, may constitute use of that deadly weapon."  State Bar of Tex., *Texas Criminal Pattern Jury Charges: Intoxication and Controlled Substances* § A3.7 cmt. (2009).  First, we note that appellant's requested instruction did not substantially track the language of this commentary definition.  Moreover, the Committee decided not to recommend a definition of "use" in its deadly weapon pattern instruction largely because "[i]n most cases, jurors' common-sense understanding of ['use'] should suffice."  *Id.* (citing an unpublished Dallas case where trial court did not err in refusing to define "exhibit" in charge).

## C. Appellant's punishment phase issue

In his third issue, appellant argues that the trial court abused its discretion when it allowed Stern to testify concerning an extraneous bad act during the punishment phase because the court did not conduct a threshold inquiry into the admissibility of the evidence and the State failed to proffer any evidence such bad act could be shown beyond a reasonable doubt. Appellant further argues that the testimony was unfairly prejudicial.

We conclude that although the trial court failed to meet its threshold responsibility, appellant was not harmed. We also conclude that the trial court did not abuse its discretion in admitting Stern's testimony per rule 403.

### 1. Standard of review

We review a trial court's decision to admit extraneous evidence during the punishment phase for an abuse of discretion. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002) (en banc) (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). The trial court's decision will not be overturned unless it falls outside the zone of reasonable disagreement. *Powell*, 63 S.W.3d at 438.

### 2. Threshold issue of admissibility

During the punishment phase, the State may offer evidence as to any matter the trial court deems relevant to sentencing, including evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which he could be held criminally responsible. TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (West 2011). Evidence is relevant to sentencing within the meaning of the statute if the evidence is "helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rodriguez v. State*, 203 S.W.3d 837, 842 (Tex. Crim. App. 2006); *see Rogers v. State*, 991 S.W.2d 263, 265

20

(Tex. Crim. App. 1999) (describing admissibility of evidence at punishment as "function of policy rather than relevancy," and decision of what punishment to assess as "a normative process").

When presented with an appropriate objection, the trial court is the authority and has the responsibility to determine the threshold issue of whether an extraneous bad act is admissible. *See Mitchell v. State*, 931 S.W.2d 950, 953–54 (Tex. Crim. App. 1996) (en banc); *Davis v. State*, 315 S.W.3d 908, 914 (Tex. App.—Houston [14th Dist.] 2010), *rev'd on other grounds*, 349 S.W.3d 517 (Tex. Crim. App. 2011). The trial court "may not admit extraneous offense evidence unless the evidence is such that a jury could rationally find the defendant criminally responsible for the extraneous offense." *Palomo v. State*, 352 S.W.3d 87, 92 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (citing *Davis*, 315 S.W.3d at 914).

"[T]o prove an extraneous offense at punishment, the State is only required to prove beyond a reasonable doubt a defendant's involvement in the bad act: a finding of guilt for a crime is not required." *Gomez v. State*, 380 S.W.3d 830, 839 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005)). Whether an extraneous offense or bad act was established beyond a reasonable doubt is a question for the jury, as the exclusive judge of the facts. *Mitchell*, 931 S.W.2d at 953–54. Further, "the jury has discretion to assess whatever punishment it sees fit, within the prescribed range." *Rodriguez*, 203 S.W.3d at 842.

This court has held trial courts properly meet the threshold requirement when they make their admissibility determination after an oral proffer by the State as to the evidence that would purportedly prove the extraneous bad act by the defendant. *See Davis*, 315 S.W.3d at 914–15; *see also Palomo*, 352 S.W.3d at 92–94 ("Although the trial court never explicitly ruled that a rational jury could find beyond a reasonable doubt from this evidence that appellant was criminally responsible for the extraneous

murder, the State's proffer and the court's questions show that the court indeed held a threshold inquiry prior to admitting the extraneous offense evidence."). Other appellate courts similarly have concluded that the trial court properly may base its threshold decision to admit testimony on the State's written proffer,[15] or oral proffer[16] or statement[17] as to how it intends to prove the alleged extraneous bad acts.

During the punishment phase, appellant moved to exclude, and requested that the trial court make a threshold determination as to the admissibility of, Stern's testimony. Without any response from the State, the trial judge stated: "Just for the record, I was the trial court Judge that presided over the—Mr. Flores' previous trial regarding the attempted capital murder charge. So, I'm aware of the evidence that was presented." Appellant continued to protest that there was not enough evidence, particularly because a State witness who testified at the prior trial would not be testifying during the punishment phase. The trial court then denied appellant's motion.

Appellant argues that the State made no attempt to provide the trial court with evidence that they could prove him criminally responsible for the shooting of Stern beyond a reasonable doubt, and that the trial court's recollection of evidence presented in a prior trial is not equivalent to a proffer of evidence by the State sufficient to satisfy the threshold inquiry. The State responds that the trial judge did not abuse her discretion by relying on her familiarity with the offense when making her threshold determination.

We cannot agree that the trial judge's statement simply as to her awareness of "the evidence that was presented" at appellant's former trial satisfies the requisite

---

[15] *Welch v. State*, 993 S.W.2d 690, 697 (Tex. App.—San Antonio 1999, no pet.).

[16] *Mann v. State*, 13 S.W.3d 89, 93–94 (Tex. App.—Austin 2000), *aff'd*, 58 S.W.3d 132 (Tex. Crim. App. 2001).

[17] *Arzaga v. State*, 86 S.W.3d 767, 781–82 (Tex. App.—El Paso 2002, no pet.).

22

threshold inquiry. Under this court's precedent in *Davis* and *Palomo*, we would be hard pressed to find the threshold requirement satisfied solely based on the nonspecific judicial recollection at issue here. Aside from the fact that in *Davis* and *Palomo*, the State provided the trial court with an oral proffer, moreover, those proffers were rather specific as to what the witness testimony would reveal. *See Palomo*, 352 S.W.3d at 93 (two first responders, a crime scene technician, two investigators, arresting officers, ballistics expert, and medical examiner would link appellant to weapon used in extraneous murder); *Davis*, 315 S.W.3d at 914 (extraneous-offense complainant would testify as to his positive identification of appellant as individual who committed aggravated robbery).[18] Here, the State clearly did not proffer and, aside from stating her general recollection of "the evidence," the trial judge did not identify what the specific relevance of Stern's testimony would be. Thus, nothing in the record reflects any particular basis for the trial court's initial admissibility determination. We conclude that under these circumstances—where the State has not provided any proffer as to Stern's testimony and where the record reflects no specific basis for the trial court's admissibility determination—the trial court failed to satisfy its responsibility to conduct a proper threshold inquiry.[19]

However, despite the trial court's error, we conclude that there was no harm. *See Welch v. State*, 993 S.W.2d 690, 697 (Tex. App.—San Antonio 1999, no pet.) (citing *Mitchell*, 931 S.W.2d at 954, and conducting harm analysis in context of challenge to

---

[18] *Cf. Arzaga*, 86 S.W.3d at 780 ("The prosecutor explained that [deputy] had been to [appellant's] residence on other domestic violence calls and that she was going to prove another assault through excited utterances[.]"); *Mann*, 13 S.W.3d at 93–94 (defendant's ex-wife would "testify as to some physical abuse that she suffered at the hands of the defendant while they were married, [and] as to his drug usage"); *Welch*, 993 S.W.2d at 697 & n.3 (extraneous-offense complainants would testify regarding other sexual assaults by appellant).

[19] We are not presented with and thus do not answer whether a trial court's recollection of specific evidence provided on the record in the absence of the State's proffer could serve to satisfy the threshold inquiry.

trial court's refusal to hold threshold evidentiary hearing). Appellant urges that his prior trial where the jury deadlocked at 6-6 did not result in a conviction, and the State thereafter dismissed the case. But the jury's determination of whether the State proved appellant's involvement in Stern's shooting beyond a reasonable doubt does not require that appellant be finally convicted of or even charged with the alleged bad act. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1); *Gomez*, 380 S.W.3d at 839 ("[A] finding of guilt for a crime is not required."). Moreover, the jury heard evidence that appellant had not been convicted; Stern testified that appellant "has never been convicted of anything involving a shooting of [her]." Finally, the trial court properly instructed the jury, the "exclusive judge of the facts," on the burden of proof of extraneous offenses. *See Mitchell*, 931 S.W.2d at 954; *Mann v. State*, 13 S.W.3d 89, 94–95 (Tex. App.—Austin 2000) (considering whether trial court gave proper instruction in harm analysis), *aff'd*, 58 S.W.3d 132 (Tex. Crim. App. 2001).

### 3. Rule 403 balancing test

Next, we analyze whether the trial court abused its discretion by overruling appellant's rule 403 objection and admitting Stern's testimony. We conclude that it did not.

Although a trial court possesses wide latitude in determining the admissibility of evidence presented at the punishment phase of trial, admitted evidence must satisfy rule 403, which governs admission of potentially prejudicial evidence. *See Rogers*, 991 S.W.2d at 266. Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" TEX. R. EVID. 403. Evidence is only inadmissible for being unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (en banc) (op. on reh'g). Thus, relevant evidence otherwise admissible under article 37.07 is inadmissible if it fails to comport

24

with rule 403. *See Rogers*, 991 S.W.2d at 266–67.

A rule 403 objection requires that the trial court balance the probative value of the evidence against its potentially prejudicial effect. *Montgomery*, 810 S.W.2d at 388–90. "In reviewing the trial court's balancing test determination, a reviewing court is to reverse the trial court's judgment 'rarely and only after a clear abuse of discretion.'" *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery*, 810 S.W.2d at 389). "Rule 403 creates a presumption of admissibility of all relevant evidence and authorizes a trial judge to exclude such evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Id.* (internal quotation marks omitted). It is therefore the objecting party's burden to demonstrate that the probative value is substantially outweighed by the danger of unfair prejudice. *Hinojosa v. State*, 995 S.W.2d 955, 958 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

A rule 403 balancing test includes, but is not limited to, four factors: (1) the probative value of the evidence, or how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable; (2) the potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *See Mozon*, 991 S.W.2d at 847; *Montgomery*, 810 S.W.2d at 389–90; *see also Sunbury v. State*, 88 S.W.3d 229, 235 (Tex. Crim. App. 2002) (suggesting in dicta that the *Montgomery* factors apply to rule 403 decisions on punishment evidence).

Appellant first argues the trial court abused its discretion by not conducting any rule 403 balancing after he objected that Stern's testimony was "highly prejudicial." We find no merit in this argument. The Court of Criminal Appeals presumes that the trial court has engaged in the required balancing test after rule 403 is invoked and "refuse[s] to hold that the silence of the record implies otherwise." *Williams v. State*,

958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997); *see also Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997) ("Although appellant asserts that the trial court did not perform the balancing test, the trial court did not explicitly refuse to do the test, it simply overruled appellant's Rule 403 objections. We find nothing in the record to indicate that the trial court did not perform a balancing test, albeit a cursory one."). Where the defendant objects on specific grounds and the trial court overrules the objection, "we assume that the trial court applied [r]ule 403 and determined that the probative value of the evidence was not substantially outweighed by any danger of unfair prejudice." *Hinojosa*, 995 S.W.2d at 957. Here, after appellant's "highly prejudicial" objection, the trial court simply refused to exclude Stern's testimony. Nothing in the record overrides the presumption that the trial court properly engaged in rule 403 balancing. "[A] trial court is not required to affirmatively state on the record either that he has conducted a balancing test or his reasons for the ruling." *Caballero v. State*, 919 S.W.2d 919, 922 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). Nor did appellant request that the trial court place any findings or conclusions from the balancing into the record. *See Williams*, 958 S.W.2d at 196.[20]

Next, appellant contends that Stern's testimony fails the rule 403 balancing test. We must measure the trial court's ruling to admit Stern's testimony "against the relevant criteria by which a [r]ule 403 decision is made." *See Mozon*, 991 S.W.2d at 847. Appellant argues that Stern's testimony was "emotionally inflammatory" in that she discussed her children and new grandchild; described how she begged for her life, that the ambulance took "like forever" and she thought she was going to die, and how scared she was and still is; and testified as to her surgeries and lasting effects. Appellant also

---

[20] Of course, appellate review would be "facilitated" if the trial court would list its reasons in the record, but this is not required. *Montgomery*, 810 S.W.2d at 393 n.4.

argues that the shooting was the main focus of the State's punishment case.[21]

With regard to factor (1), the evidence provided by Stern was highly probative. Stern's evidence of this extraneous shooting—which occurred while appellant already was on bond for the drug and retaliation[22] offenses—allowed the jury to gauge whether he potentially would continue to engage in criminal behavior upon release and thus whether to assess his punishment at the higher end of the statutory range. TEX. PENAL CODE ANN. § 12.33 (West 2011); *see Rodriguez*, 203 S.W.3d at 842; *Rogers*, 991 S.W.2d at 265–66. As the State argued during its punishment closing, this evidence provided the jury with more information for it to "tailor an appropriate sentence." *See Sunbury*, 88 S.W.3d at 233–34.

With regard to factor (2), although Stern's testimony certainly included emotional aspects, her statements concerning how she felt during the shooting and what happened to her as a result primarily concerned the circumstances of and her personal experience of the extraneous bad act itself. *Cf. Espinosa v. State*, 194 S.W.3d 703, 711 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (testimony of witness to offense at issue, which "included her personal observances of the events surrounding the shooting" and that "she was scared at the time," was "admissible for the fact-finder's consideration when assessing punishment").[23] In assessing punishment, jurors are permitted to make "value judgments based on the evidence that they receive." *Rogers*, 991 S.W.2d at 266. Moreover, the record reflects that Stern, for the most part, delivered her testimony

---

[21] We note that appellant does not limit this particular argument to Stern's testimony. However, appellant failed to object on the basis of rule 403 to any other State's witness or evidence related to the extraneous shooting.

[22] During the punishment phase, Vanderberry testified that appellant threatened him during the traffic stop. Appellant told Vanderberry, "Do you know what family I belong to?" and "We can get to you at any time and your family." Vanderberry understood appellant to be referring to the Mexican Mafia, a prison gang. Appellant was charged with retaliation.

[23] Further, appellant never objected, and does not argue on appeal, that any specific portion of Stern's testimony constituted impermissible victim-impact testimony.

27

matter of factly, without becoming overly emotional. Nor did the State emphasize any emotional aspects of Stern's testimony during closing. Thus, we cannot conclude that Stern's testimony appealed only to the jurors' emotional side and that the jury irrationally based its decision on emotion rather than the relevant evidence. *See Caballero*, 919 S.W.2d at 922 (recognizing that "[t]estimony which emphasizes the human impact of the crime may be prejudicial to the defense" but concluding robbery victim's testimony about his fear he would never see his beautiful wife and three-year-old daughter again "did not rise to unfair prejudice").

With regard to factor (3), we tend to agree with appellant that the State spent a significant amount of time developing Stern's testimony during the punishment phase.[24] However, with regard to factor (4), Stern's testimony was particularly important in that she was the extraneous-offense complainant who identified appellant as the shooter. While the State argued during closing that it presented other evidence to corroborate appellant's involvement in the shooting,[25] that evidence would not have been as compelling without Stern's own testimony. Beyond the cell phone and ankle-monitoring records, which provided circumstantial evidence that appellant was not at home and instead was near Stern's apartment around the time of the shooting, Stern provided direct evidence identifying appellant "a hundred percent" as her shooter.

Based on our evaluation of the rule 403 balancing factors, and keeping in mind

---

[24] Stern's testimony on direct comprised approximately one-fourth of the State's total punishment case.

[25] The State also presented testimony from an HPD homicide officer involved in the shooting investigation; the man initially identified as the alleged shooter by Stern; Stern's daughter-in-law who was talking to Stern by cell phone during the shooting; a private investigator whom the Stern family had hired after two prior attempted shooting incidents at their home; the person who installed appellant's ankle device to monitor appellant while he was on bond for the cocaine, marijuana, and retaliation charges; a Harris County pretrial officer who testified that appellant was not at home at the time of the shooting based on monitoring records; and an HPD officer in communication intelligence who testified as to appellant's movements on the morning of May 5 based on cell phone records.

that admissibility of evidence during punishment serves a normative, policy function, we conclude the trial court did not abuse its discretion in concluding that the danger of unfair prejudice did not substantially outweigh the probative value of Stern's testimony. *See Mozon*, 991 S.W.2d at 847; *Rogers*, 991 S.W.2d at 267. Therefore, we overrule appellant's third issue.

## D. Appellant's court costs issue

In his fourth issue, appellant argues that there was insufficient evidence to support the court costs of $905 assessed against him in the judgment. Appellant requested the district clerk include the bill of costs in the appellate record. The original clerk's record filed with this court did not contain a bill of costs. A few months after appellant filed his brief, the district clerk filed a supplemental record consisting of a "Criminal Bill of Cost." Appellant objected to this "bill of cost" because there is no evidence to support that it was part of the original record before the trial court. *See Johnson v. State*, 389 S.W.3d 513, 515 n.1 (Tex. App.—Houston [14th Dist.] 2012, pet. granted).

The State argues that the record supports an assessment of over $905[26] in court costs based on the "bill of cost" in the supplemental record and based on numerous provisions in the Texas Code of Criminal Procedure and the Local Government Code that authorize various court costs to be paid by appellant.

In *Johnson*, we held that when the record does not support the assessment of a certain dollar amount in costs, the trial court errs in entering a specific dollar amount in its judgment. 389 S.W.3d at 516. Further, this court has rejected supplemental records as not being "appropriate" bills of cost when such documents do "not appear to have been brought to the attention of the trial court judge." *Latson v. State*, —S.W.3d—, No. 14-12-00559-CR, 2013 WL 4487544, at *3 (Tex. App.—Houston [14th Dist.] Aug. 22,

---

[26] The State maintains that the amount appellant is mandated to pay by statute is $909.

2013, no. pet. h.) ("This court has determined that an unsigned computer screen printout from JIMS, that does not appear to have been brought to the attention of the trial court judge, is not an actual bill of costs as contemplated by article 103.001."); *Jelks v. State*, 397 S.W.3d 759, 760 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (concluding that a computer screen printout from JIMS dated and signed by an unidentified individual, when printout was not presented to the trial judge, could not be considered an appropriate bill of costs); *Johnson*, 389 S.W.3d at 515 n.1 ("[T]here is no indication that this [unsigned] printout was ever brought to the attention of the trial judge.").

While the "Criminal Bill of Costs" provides an "Assessed Date" of June 29, 2012,[27] and bears a signature stamp by the district clerk, its "printout" date is April 4, 2013, which matches the date a deputy of the district clerk certified that it was a "a true and correct copy of the original record filed and/or recorded in [the clerk's] office . . . as it appears on this date." However, no such "original record" existed in the clerk's record as of the time the appeal was filed, nor is there any evidence in the record that any such document was presented to or brought to the attention of the trial court before it included the specific dollar amount in the judgment. *See Latson*, —S.W.3d—, 2013 WL 4487544, at *3; *Jelks*, 397 S.W.3d at 760; *Johnson*, 389 S.W.3d at 515, n.1. Further, in *Rogers v. State*, we rejected the State's argument that sufficient evidence supported the imposed court costs based on authorization by various statutes. 402 S.W.3d 410, 420 (Tex. App.—Houston [14th Dist.] 2013, no pet. h.).

Therefore, because there is no evidence in the record to support the trial court's assessment against appellant of $905 as court costs, we sustain his fourth issue and modify the trial court's judgment to delete the specific dollar amount of costs assessed. *See Johnson*, 389 S.W.3d at 517.

Appellant requests additional relief in the form of an order to the Texas

---

[27] The trial court signed its judgment on this date.

Department of Criminal Justice to (1) reimburse all money that has been withdrawn from his inmate trust account under section 501.014(e)(4) of the Texas Government Code and (2) to refrain from withdrawing any other funds. For the same reasons provided in *Latson*, we decline to order any additional relief. *See* —S.W.3d—, 2013 WL 4487544, at *4.

## III. CONCLUSION

Having sustained appellant's fourth issue, we modify the judgment to delete the specific amount of court costs. Having found no reversible error otherwise, we affirm the judgment as modified.

/s/    Tracy Christopher
Justice

Panel consists of Justices Brown, Christopher, and McCally.

Publish — TEX. R. APP. P. 47.2(b).